

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03 CR 90 |
| | ) | |
| FERNANDO DELATORRE, also known as | ) | Judge Ruben Castillo |
| "Fern," Fern-dog," and "Fernwood," | ) | |
| BOLIVAR BENABE, also known as "Jap," | ) | |
| JUAN JUAREZ, also known as "Ghost," | ) | |
| JULIAN SALAZAR, also known as "Mando," | ) | |
| "Comrade," "Conrad," Cuz," and "Cuzzo," | ) | |
| HAROLD CROWDER, also known as "H-Man,") | | |
| CHRISTIAN GUZMAN, also known as | ) | |
| "Mousey," and STEVEN SUSINKA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Presently before this Court are the defendants' motions for a new trial, or alternatively an evidentiary hearing, based on alleged juror misconduct. For the reasons stated herein, the motions are denied.

## BACKGROUND

In this long-running case, the government charged sixteen defendants—all alleged members of the Insane Deuce Nation Street Gang ("Insane Deuces")—with violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), committing various violent crimes in aid of the racketeering activity, and drug trafficking. One defendant, Akeem Horton, pled guilty (R. 380), and another defendant, Miguel Martinez, is a fugitive. The fourteen remaining defendants are: Fernando Delatorre ("Delatorre"), Miguel Rodriguez ("Rodriguez"),

Steven Perez ("Perez"), Romel Handley ("Handley"), Steven Susinka ("Susinka"), Juan Juarez

("Juarez"), Christian Guzman ("Guzman"), Julian Salazar ("Salazar"), Bolivar Benabe

("Benabe"), Moriano Morales ("Morales"), Arturo Barbosa ("Barbosa"), Harold Crowder

("Crowder"), Brian Hernandez ("Hernandez"), Lionel Lechuga ("Lechuga"). The Indictment

charged the defendants with multiple violations of federal law, delineated as follows:

## Count One: RICO Conspiracy

Count One of the Second Superseding Indictment ("Indictment") alleged that each of the

fourteen defendants conspired to violate 18 U.S.C. § 1962(c) through a pattern of racketeering

activity, in violation of 18 U.S.C. § 1962(d). (R. 227, Indictment, Count One, ¶ 9.) The

Indictment alleged that the defendants agreed that a conspirator would commit at least two of the

following acts of racketeering: murder, attempted murder, solicitation to commit murder,

robbery, witness tampering, and multiple narcotics offenses. (*Id.* ¶¶ 10-11.) Specifically, the

Indictment alleged the following acts of racketeering were committed as part of the conspiracy,

in violation of 18 U.S.C. § 1962(d):

- On or about January 20, 2002, Juarez, Salazar, Martinez, Perez, Hernandez, and others, known and unknown to the Grand Jury, committed and caused to be committed the attempted murder of a Victim A, in which Perez discharged the firearm which permanently disabled and disfigured Victim A. (*Id.* ¶ 13.)

- On or about January 20, 2002, Juarez, Salazar, Martinez, Perez, Hernandez, and others, known and unknown to the Grand Jury, committed and caused to be committed, the attempted murder of a Victim B. Perez discharged the firearm which permanently disabled and disfigured Victim B. (*Id.* ¶ 14.)

- On or about February 12, 2002, Delatorre, Juarez, Salazar, Martinez, Crowder, Susinka, and others, known and unknown to the Grand Jury, committed and caused to be committed, the murder of Robert Perez. Crowder discharged the firearm that killed Perez. (*Id.* ¶ 15.)

2

- On or about August 11, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Guzman, and others, known and unknown to the Grand Jury, committed and caused to be committed, the murder of David Lazcano. Guzman discharged the firearm that killed Lazcano. (*Id.* ¶ 16.)

- On or about September 19, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Guzman, Horton, and others, known and unknown to the Grand Jury, committed and caused to be committed, the attempted murder of a Victim C. Guzman discharged the firearm that permanently disabled and disfigured Victim C. (*Id.* ¶ 17.)

- On or about September 28, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, and others, known and unknown to the Grand Jury, committed and caused to be committed, the attempted murder of Victim D. Co-conspirator A discharged the firearm that permanently disabled and disfigured Victim D. (*Id.* ¶ 18.)

- On or about October 16, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Horton, Co-conspirator B, and others, known and unknown to the Grand Jury, committed and caused to be committed, the murder of David Morales. Co-conspirator B discharged the firearm that killed David Morales. (*Id.* ¶ 19.)

- On or about November 17, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Co-conspirator B, and others, known and unknown to the Grand Jury, committed and caused to be committed, the murder of Urbel Valdez. Co-conspirator B discharged the firearm that killed Urbel Valdez. (*Id.* ¶ 20.)

- On or about May 11, 2003, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Perez, and others, known and unknown to the Grand Jury, committed and caused to be committed, the attempted murder of Victim E. Perez discharged the firearm that permanently disabled and disfigured Victim E. (*Id.* ¶ 21.)

- Beginning at least from in or about late 1994, and continuing through at least the date of return of the Indictment, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Rodriguez, Susinka, Hernandez, Lechuga, Horton, and others, known and unknown to the Grand Jury, conspired to knowingly and intentionally distribute and possess with intent to distribute controlled substances. (*Id.* ¶ 22.)

## Count Two: Murder of David Lazcano

In Count Two, the Indictment alleged that on August 11, 2002, Delatorre and Guzman,

and others known and unknown to the Grand Jury, for the purpose of gaining entrance to, and for

3

maintaining and increasing the defendants' position in the Insane Deuces, knowingly and intentionally murdered David Lazcano, in violation of 18 U.S.C. §§ 1959(a)(1) and (2). (R. 227, Indictment, Count Two, ¶¶ 3-4.)

## Count Three: Conspiracy to Murder Victim F

In Count Three, the government charged that beginning as early as August 15, 2002, until at least August 22, 2002, Salazar, and others known and unknown to the Grand Jury, for the purpose of gaining entrance to, and for maintaining and increasing the defendant's position in the Insane Deuces, did knowingly and intentionally conspire to murder Victim F, in violation of 18 U.S.C. §§ 1959(a)(5) and (2). (R. 227, Indictment, Count Three, ¶¶ 2-3.)

## Count Four: Conspiracy to Murder Victim G

In Count Four, the government alleged that beginning as early as September 15, 2002, and continuing to at least November 2002, Juarez, Salazar, Morales, and Barbosa, and others known and unknown to the Grand Jury, for the purpose of gaining entrance to, and for maintaining and increasing the defendants' positions in the Insane Deuces, did knowingly and intentionally conspire to murder Victim G, in violation of 18 U.S.C. §§ 1959(a)(5) and (2). (R. 227, Indictment, Count Four, ¶¶ 2-3.)

## Count Five: Assault with a Dangerous Weapon Upon Victim C

In Count Five, the Indictment alleged that on September 19, 2002, Delatorre, Guzman, and Horton, and others known and unknown to the Grand Jury, for the purpose of gaining entrance to, and for maintaining and increasing the defendants' position in the Insane Deuces, did knowingly and intentionally assault Victim C with a dangerous weapon, in violation of 18 U.S.C. §§ 1959(a)(3) and (2). (R. 227, Indictment, Count Five, ¶¶ 2-3.)

4

**Count Six: Murder of David Morales**

In Count Six, the government charged that on October 16, 2002, Delatorre and Horton, and others known and unknown to the Grand Jury, including Co-conspirator B, for the purpose of gaining entrance to, and for maintaining and increasing the defendants' positions in the Insane Deuces, did knowingly and intentionally murder David Morales, in violation of 18 U.S.C. §§ 1959(a)(1) and (2). (R. 227, Indictment, Count Six, ¶¶ 2-3.)

**Count Seven: Murder of Urbel Valdez**

In Count Seven, the government charged that on November 17, 2002, Delatorre, and others known and unknown to the Grand Jury, including Co-conspirator B, for the purpose of gaining entrance to, and for maintaining and increasing the defendants' position in the Insane Deuces, did knowingly and intentionally murder Urbel Valdez in violation of 18 U.S.C. §§ 1959(a)(1) and (2). (R. 227, Indictment, Count Seven, ¶¶ 2-3.)

**Count Eight: Assault with a Dangerous Weapon upon Victim E**

In the last substantive RICO count, Count Eight, the Indictment charged that on May 11, 2003, Perez, and others known and unknown to the Grand Jury, for the purpose of gaining entrance to, and for maintaining and increasing the defendant's position in the Insane Deuces, did knowingly and intentionally commit assault with a dangerous weapon upon Victim E, in violation of 18 U.S.C. § 1959(a)(3) and (2). (R. 227, Indictment, Count Eight, ¶¶ 2-3.)

**Counts Nine-Twelve: Narcotics Offenses**

Count Nine charged that Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Rodriguez, Hernandez, Lechuga, Horton, and Susinka violated 21 U.S.C. § 846 by conspiring with each other to distribute and possess with intent to distribute cocaine, crack cocaine, and

5

marijuana, in violation of 18 U.S.C. § 841(a)(1). (R. 227, Indictment, Count Nine ¶¶ 1-2.) The Indictment alleged that as part of the conspiracy, the defendants used profits from the sale of the drugs to pay dues, buy guns, and finance parties for the Insane Deuces, as well as to "bond" gang members out of jail. (*Id.* ¶¶ 3-4.) Furthermore, the Indictment charged that the defendants engaged in violent acts against rival gang members to protect and increase the Insane Deuce drug sales. (*Id.* ¶ 6.) Specifically, the Indictment identifies the following drug transactions as part of the conspiracy:

- On or about April 15, 2002, Susinka negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 9.)

- On or about May 31, 2002, Martinez negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 10.)

- On or about June 10, 2002, Delatorre negotiated the sale of, and then sold, approximately 52 grams of crack cocaine to a cooperating individual. (*Id.* ¶ 11.)

- On or about June 11, 2002, Insane Deuce gang member and co-conspirator John Landeros ("Landeros") negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 12.)

- On or about June 28, 2002, Martinez negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 13.)

- On or about August 21, 2002, Landeros negotiated the sale of, and then sold, approximately 56 grams of crack cocaine to a cooperating individual. (*Id.* ¶ 14.)

- On or about September 18, 2002, Salazar negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 15.)

- On or about October 9, 2002, Delatorre negotiated the sale of, and then sold, approximately 52 grams of crack cocaine to a cooperating individual. (*Id.* ¶ 16.)

Counts Ten and Eleven charged Martinez, who remains a fugitive, with knowingly and intentionally distributing mixtures containing cocaine, in violation of 21 U.S.C. § 841(a)(1).

Count Twelve of the Indictment charged that on or about October 9, 2002, Delatorre knowingly and intentionally distributing in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, in violation of 21 U.S.C. § 841(a)(1).

**Counts Thirteen-Fourteen: Firearms Offenses**

In Count Thirteen, the government accused Delatorre of knowingly possessing a firearm, a Sturm Ruger, Model P-89, 9mm semi-automatic pistol, with the importer's and manufacturer's serial number removed, obliterated, and altered, which had been transported in interstate commerce, in violation of 18 U.S.C. § 922(k).

Count Fourteen charged that Benabe, having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed firearms in and affecting interstate commerce in that the firearms had traveled in interstate commerce prior to defendant's possession of the firearms, namely, a Rossi, Model 71, .357 magnum revolver bearing serial number F384238, and a Intratec, Model Tec-22, .22 caliber pistol with an obliterated serial number, in violation of 18 U.S.C. § 922(g)(1).

Count Fifteen charged that Benabe knowingly possessed a firearm, namely, an Intratec Model Tec-22, .22 caliber pistol, which had the manufacturer's serial number removed, obliterated, and altered, which firearm had been transported in interstate commerce, in violation of 18 U.S.C. § 922(k).

### A.    Pre-Trial Proceedings

In light of the number of the defendants and the complexity of the issues presented, this Court was called to make numerous difficult decisions prior to trial. Upon motion of defendants, and after careful consideration, this Court decided to severe the trial of the fourteen defendants

into two groups. *United States v. Delatorre*, 522 F. Supp. 2d 1034 (N.D. Ill. 2007). The first group consisted of Guzman, Benabe, Juarez, Salazar, Delatorre, Crowder, and Susinka; this group was to be tried before this Court.[1] (*Id.* at 1056-57.) The second group consisted of Handley, Rodriguez, Barbosa, Lechuga, Morales, Hernandez, and Perez; this second group is scheduled to proceed to trial before Judge Leinenweber on October 6, 2008.[2] (R. 906, Minute Entry.)

Upon the motion of the government, this Court also made the decision to empanel an anonymous jury in the trial of the first group. *United States v. Delatorre*, No. 03-90, 2008 WL 161702 (N.D. Ill. Jan. 15, 2008). In the Court's fourteen years on the bench, this was the first time the Court had ever seated an anonymous jury. *Id.* at *4. Nevertheless, after much consideration, the Court determined that the government established that the defendants "have a history of intimidating witnesses or otherwise obstructing justice such that they may do so in connection with this trial." *Id.* at *2. The Court further determined that defendants had the means of intimidation, as one defendant was still a fugitive, and there were other Insane Deuce members still at large who were not charged as defendants in this case. *Id.* The Court also

---

[1] The Court also severed the trial on Counts Fourteen and Fifteen against Benabe, which were to be tried immediately following the trial of the first group of defendants. *Delatorre*, 522 F. Supp. 2d at 1058.

[2] In order to ensure the speedy trial rights of the second group of defendants, this Court determined that it would seek the aid of a volunteer judge to preside over their trial. *Delatorre*, 522 F. Supp. 2d at 1057. Senior Judge Harry D. Leinenweber graciously agreed to preside over this portion of the case. (R. 552, Minute Entry.) The trial of the second group of defendants commenced on April 2, 2008, before Judge Leinenweber, but shortly after a jury was picked and open arguments began, a mistrial was declared after one of the jurors requested to be removed from the jury, and several other jurors expressed concerns for their personal safety. (R. 884, Minute Entry; Tr. of Proceedings, Apr. 2, 2008.) Judge Leinenweber thereafter rescheduled the trial to begin in October 2008. (R. 906, Minute Entry.)

8

concluded that the nature of the allegations, which included murder and attempted murder of government witnesses, might cause jurors undue concern for their own safety. *Id.*

Shortly before the trial was scheduled to begin, this Court also made the difficult decision to exclude Delatorre and Benabe from the trial. This unfortunate situation was made necessary by their disruptions, outbursts, and repeated assertions of invalid jurisdictional objections during court proceedings, and their refusal to respond to this Court's questioning about whether they intended to conduct themselves appropriately during the trial. (*See* R. 696, Mem. Opinion & Order; R. 717, Mem. Opinion & Order; Tr. of Proceedings, Feb. 5, 2008 ("2/5/08 Tr.").) In order to ensure the fair trial rights of the other defendants, the Court excluded these two defendants from the trial, permitting them to watch the proceedings via closed-circuit television from the Metropolitan Correctional Center, and advising that they could return any time they were able to assure the Court that they would not disrupt the proceedings.[3] (2/5/08 Tr. at 1-26.)

### B.  The Trial

With these and numerous other procedural matters resolved (*see, e.g.,* R. 697, Minute Entry; R. 698, Minute Entry; R. 711, Minute Entry; R. 719, Mem. Opinion & Order), the trial of the first group of defendants began before this Court on February 6, 2008. (R. 739, Minute Entry.) For two days, the Court conducted extensive *voir dire* of the potential jurors, questioning them about their ability and willingness to serve on such a lengthy trial, and exploring any potential biases they had that would preclude them from fairly deciding this difficult case. (Trial Tr. at 17-346.) Ultimately, 12 jurors and six alternates were selected. (Trial Tr. at 342.)

---

[3] These defendants subsequently refused to watch the trial via closed-circuit television, and ultimately the cameras were removed from the courtroom. The defendants also never indicated a willingness to rejoin the proceedings.

Over the course of the next two months, the jurors heard testimony from more than 100 government witnesses and 15 defense witnesses. (Trial Tr. at 346-5383.) Among the evidence presented by the government was the testimony of former Insane Deuces gang members now cooperating with the government, including Orlando Rivera, a former high-ranking member of the Aurora Insane Deuces; undercover audiotapes of gang meetings; undercover videotapes; videotaped confessions of Delatorre; eyewitness identifications; and weapons, drugs, and gang-related documents recovered from the defendants' homes. During the eight weeks of testimony, only one juror was excused after she slipped on the ice and broke her wrist. (Trial Tr. at 725-26.) A total of seventeen jurors heard the entirety of the evidence in this case. At the close of the evidence, the Court pared the jury down to twelve, and on April 4, 2008, these twelve began their deliberations. (*Id.* at 6154-55.)

On April 21, 2008, after deliberating for more than two weeks, the jury found the defendants guilty on all but three counts. (R. 921-929, Jury Verdict Forms.) The jury found Guzman not guilty on Count Five, and they were unable to reach a verdict on Count One against Crowder and on Count Nine against Susinka. (R. 921, 928, 929, Jury Verdict Forms.) The Court declared a mistrial on these latter two counts. (R. 943, Minute Entry.) After further proceedings and two more days of deliberations, on April 23, 2008, the jury returned its verdict on Phase II, the special factual findings pertaining to sentencing, and Phase III, pertaining to forfeiture. (R. 930-59.)

## C.    Post-Trial Proceedings

### 1.    Letter From the Assistant U.S. Attorney

Approximately three weeks after the trial ended, on May 13, 2008, this Court received a

10

letter from Assistant U.S. Attorney Patrick Pope ("AUSA Pope"), stating that Court Security Officer Kathy McCauley ("CSO McCauley" or "the CSO"), the bailiff responsible for overseeing the jury during its deliberations, had engaged in an unsolicited, post-verdict conversation with other government attorneys as they were passing through the lobby of the federal courthouse.[4] During that conversation, CSO McCauley reportedly made certain statements of which AUSA Pope felt the need to apprise the Court. Specifically, CSO McCauley reportedly stated that at some point during jury deliberations she informed the jurors "that they needed to be civil with each other." (5/13/08 Letter at 1.) CSO McCauley also reportedly stated that she confirmed to the jurors at some point during the trial that the defendants were in custody, "but further stated words to the effect that it was their verdict." (*Id.*)

Immediately upon receiving AUSA Pope's letter, the Court set the matter for a status hearing on May 16, 2008. (R. 974, Minute Entry.) At that hearing, all defendants and their counsel were present. (R. 977; Minute Entry; Tr. of Proceedings, May 16, 2008 ("5/16/08 Tr.").) Suggestions were made as to how the Court should proceed, and after discussion, including private discussions among defense counsel, it was agreed that, due to concerns about the potential self-interest of the CSO, the Court would proceed directly to questioning the jury foreperson about any conversations the CSO may have had with the jurors. (5/16/08 Tr. at 11-12; R. 977, Minute Entry.) After communicating with the jury foreperson regarding her availability, the Court set the hearing for May 30, 2008. (R. 978, Minute Entry.)

---

[4] The letter, which AUSA Pope previously sent to the Court and all defense counsel, is attached to this opinion so as to be made part of the record.

11

## 2.    Salazar's Motion Alleging Juror Misconduct

Prior to the hearing, on May 23, 2008, Salazar filed a motion for a new trial raising other claims of alleged juror misconduct.[5] (R. 979, Salazar's Mot. for New Trial.) Specifically, Salazar alleged that his cousin, Rachel Perez ("Ms. Perez"), sat through the trial and recognized two of the jurors, Juror 79 and Juror 384, as individuals she had worked with at the Fox Valley branch of the U.S. Postal Service ("Postal Service"). (*Id.*) According to Ms. Perez's affidavit, Juror 79, who was purportedly a temporary employee of the Postal Service, met Ms. Perez's brother, defendant Steven Perez (who is being tried with the other group of defendants) sometime in 2005. (R. 979, Salazar's Mot. for New Trial, Ms. Perez's Aff. ¶ 6.) Ms. Perez also claims that she mentioned this case to Juror 79 at the time her cousin, Salazar, was arrested in 2005. (*Id.* ¶ 7.) She states that "[a]bout a year later" she and Juror 79 "ran into each other in Walmart, but we did not talk about the case." (*Id.* ¶ 8.) Ms. Perez also claims that Juror 384 works at the Fox Valley branch of the Postal Service, and that Juror 384 "knows me and I know her, but we have never talked about the case." (*Id.* ¶ 10.) Based on Ms. Perez's affidavit, Salazar argues that these two jurors intentionally concealed information and should be presumed biased, thus depriving him of his right to a fair trial. (R. 979, Salazar's Mot. for New Trial.)

## 3.    The Hearing With The Jury Foreperson

On May 30, 2008, a hearing was held wherein the Court questioned the jury foreperson under oath. (Tr. of Proceedings, May 30, 2008 ("5/30/08 Tr.").) All defendants and their

---

[5] The Court notes that the defendants have filed additional post-trial motions seeking acquittal or a new trial on various other grounds. (R. 1005, Delatorre's *Pro Se* Mot. for Reversal; R. 1012, Juarez's Mot. for New Trial; R. 1014, Defs.' Mot. for Acquittal; R. 1015, Benabe's *Pro Se* Mot. to Vacate Verdict.) These motions are presently being briefed and will be decided by separate opinion. (R. 1016, Minute Entry.)

attorneys were present at this hearing. (*Id.*) The Court started the hearing by advising the foreperson not to concern herself "about where the truth takes us. The main thing is just to be truthful in how the deliberations were conducted." (*Id.* at 7.) At the hearing, the Court employed the following procedure: (1) the Court questioned the foreperson; (2) the Court then excused the foreperson and solicited additional questions from the government, defense counsel, and the defendants; (3) the Court then brought the foreperson back in the courtroom for additional questioning. (*Id.* at 4-34.) This process was repeated four times during the hearing. (*Id.*)

As to the issue of the CSO telling the jurors to be "civil" with one another, the foreperson testified that she recalled a conversation in which the CSO had made such a statement. (*Id.* at 10.) According to the foreperson, this conversation occurred at the beginning of deliberations, after deliberations "got a little heated" and one of the jurors "kind of shut down a little bit" because the other jurors did not agree with her positions. (*Id.* at 10.) According to the foreperson, that juror indicated she might want to send a note to the Court asking to be removed from the jury. (*Id.* at 16-17.) At that point, the foreperson intervened and "reengaged" that particular juror, and deliberations proceeded. (*Id.* at 10, 17.)

The foreperson testified that during a subsequent break in deliberations, she privately informed the CSO that "[t]here may be a situation where I need to talk with the judge or get a note to the judge." (*Id.* at 11, 17.) The CSO thereafter stated something to the effect that the jurors "need to be civil" toward one another. (*Id.* at 18.) The CSO made this statement as she was standing in the foyer of the jury room, near the bathrooms. (*Id.*) Although the jurors were within earshot, the foreperson was not certain that they were paying attention or heard the CSO's statement, because they were in the process of breaking for lunch or for the day. (*Id.* at 26.)

13

As to the issue of whether the defendants were being detained, the foreperson testified that there was a brief discussion among the jurors prior to their formal deliberations as to why two of the defendants were absent from the trial. (*Id.* at 8.) Based on testimony at the trial, the jurors subsequently realized that the five defendants who were present in the courtroom were in fact in custody. (*Id.* at 19-20.) She testified that the discussion about the defendants' custodial status did not play any role in the deliberations. (*Id.* at 9.) According to the foreperson, there was never any discussion with CSO McCauley on the issue of the defendants' custodial status. (*Id.* at 8, 9-10.)

According to the foreperson, CSO McCauley never stated that it was "your verdict" or words to those effect. (*Id.* at 28.) At no point did CSO McCauley comment on the evidence or indicate to the jury what their verdict should be. (*Id.* at 11.) She testified that nothing CSO McCauley said to the jury played any role in the verdicts. (*Id.*)

The Court thereafter turned the inquiry to the issues raised in Salazar's motion. (*Id.* at 20.) The Court asked the foreperson whether any juror had "indicate[d] that they knew some of the people involved in this case by some happenstance." (*Id.* at 20.) The foreperson testified that Juror 79 stated that her son had been a member of the Insane Deuces. (*Id.* at 21, 30.) According to the foreperson, Juror 79 made this statement during jury selection, and "once after the trial started." (*Id.* at 27.) When the foreperson asked Juror 79 if this Court was aware of the information about her son, Juror 79 reportedly stated that she sent the Court a note at the beginning of the trial advising the Court of this information. (*Id.* at 27.)

According to the foreperson, Juror 79 also stated at some point during the trial that she saw some of the defendants' family members who were sitting in the audience outside of court.

14

She reported that she saw some of them on the train, and was "a little frightened" about this. (*Id.* at 32.) She also reported seeing one family member "in a Wal-Mart or Kmart or something." (*Id.* at 27.) According to the foreperson, Juror 79 stated that she "knew of" the person she had seen while shopping, and she thought the person was related to one of the defendants. (*Id.* at 31.) According to the foreperson, the statements Juror 79 made about seeing the family members did not play any role in the jury's deliberations or in the verdicts. (*Id.* at 20-21.) She testified that Juror 79 did not appear to have any predisposition to render a verdict one way or the other. (*Id.* at 31.)

At the close of the hearing, the Court invited the parties to submit statements outlining their positions as to how the Court should proceed in light of the foreperson's testimony. (*Id.* at 33.) Those statements have now been received by the Court. (R. 995, Salazar's Suppl. Regarding Jury Misconduct; R. 996, Gov't's Mem. Regarding Post-Trial Hearing; R. 998, Benabe's *Pro Se* Notice Pertaining to Jury Bias; R. 1001, Benabe's Mem. on Juror Statements; R. 1011, Gov't's Resp. to Defs.' Mem. Regarding Juror Misconduct; R. 1017, Salazar's Reply.)

## ANALYSIS

### I. Statements by CSO McCauley

When faced with a post-trial claim that extraneous contact may have affected the jury's ability to be fair, the usual course is for the Court to conduct a hearing with all interested parties. *Remmer v. United States*, 347 U.S. 227 (1954); *United States v. Warner*, 498 F.3d 666 (7th Cir. 2007); *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132 (7th Cir. 1992). However, "[d]istrict courts have some flexibility in structuring an inquiry into this kind of problem." *Warner*, 498 F.3d at 680. In some instances no hearing will be necessary, for example, "where a comment

15

heard by a juror was ambiguous and innocuous." *Id.* (citing *Whitehead v. Cowan,* 263 F.3d 708, 723 (7th Cir. 2001).) To warrant an inquiry by the Court, "the extraneous communication to the juror must be of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury. How much inquiry is necessary (perhaps very little, or even none) depends on how likely was the extraneous communication to contaminate the jury's deliberations." *United States v. Spano,* 421 F.3d 599, 605 (7th Cir. 2005). Further, "[t]he integrity of the jury proceedings must not be jeopardized by unauthorized invasions." *Remmer,* 347 U.S. at 229.

The general rule is that the district court should "determine the circumstances surrounding the improper contact and the impact thereof on the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Warner,* F.3d at 680. That is what the Court did here. Immediately upon receiving the government's letter about CSO McCauley, the Court held a status conference with all parties and the attorneys. After receiving input from all parties, the Court determined (with the agreement of the parties) that the best course was to proceed directly to questioning the jury foreperson rather than questioning CSO McCauley. (5/16/08 Tr. at 11-12.) A hearing was held with the jury foreperson the following week, and again all parties and their counsel were present and permitted to participate. (5/30/08 Tr.) Although the Court conducted the questioning, the attorneys and the defendants themselves were given input into the questions that were posed, with the Court breaking three separate times for the parties to propose appropriate follow-up questions in light of the testimony. (5/30/08 Tr. at 12, 23, 28.)

In conducting the hearing, the Court was guided by Federal Rule of Evidence 606(b),

16

which provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form. A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b). In questioning the foreperson, this Court made every effort to tread lightly pursuant to Rule 606(b), but also to conduct a thorough inquiry into whether defendants' fair trial rights were violated. Based on the testimony at the hearing, the Court concludes that defendants' rights were not violated by any improper contact between the jury and CSO McCauley.

Claims of external influences on jurors are subject to harmless error analysis. *Warner*, 498 F.3d at 679. "Due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *United States v. Olano*, 507 U.S. 725, 738 (1993). This Court has substantial discretion to determine whether prejudice arising from unauthorized contact is harmless. *Warner*, 498 F.3d at 679; *United States v. Sababu*, 891 F.2d 1308, 1335 (7th Cir. 1989). The ultimate question is "whether the jurors' deliberations were fatally compromised by their exposure to the [extraneous] materials." *Spano*, 421 F.3d at 605. In making this determination, the extraneous information must be viewed in context. *Warner*, 498 F.3d at 679. The Court

17

must also consider whether the extraneous information related to the defendant's guilt or innocence; if so, the evidence is more likely to have been prejudicial. *Id.* Here, the extraneous contact between the jury and CSO McCauley, although unfortunate, was minimal and involved tangential matters not pertaining to defendants' guilt or innocence.

First, the foreperson's testimony revealed that the CSO on one occasion informed the jurors something to the effect that they must "be civil" to one another during deliberations. (5/30/08 Tr. at 10-11, 17-18.) According to the foreperson, the jurors may not have been listening when the CSO made this statement because they were in the process of taking a break. (*Id.* at 26.) Even assuming all the jurors heard this statement, it would not have fatally comprised the deliberations. The statement in no way pertained to defendant's guilt or innocence, but simply to how the jurors should conduct themselves in the jury room. The statement was fully consistent with this Court's instructions as to how the jury should deliberate. Specifically, the Court instructed:

> The verdict must represent the considered judgment of each juror.
> Your verdict, whether it be guilty or not guilty, must be
> unanimous. You should make every reasonable effort to reach a
> verdict. In doing so, you should consult with one another, express
> your own views, and listen to the opinions of your fellow jurors.
> Discuss your differences with an open mind. Do not hesitate to re-
> examine your views and change your opinion if you come to
> believe it is wrong, but you should not surrender your honest
> beliefs about the weight or effect of evidence solely because of the
> opinions of your fellow jurors or for the purpose of returning a
> unanimous verdict.

(Trial Tr. at 6151-52.) Although the Court did not specifically instruct the jurors to be "civil" to one another, this is in essence how the Court instructed the jury to proceed with their deliberations.

18

Additionally, the record indicates that the statement about being "civil" was made by the CSO early in the deliberations. (5/30/08 Tr. at 10.) The fact that the jury went on to deliberate for nearly two weeks, and ultimately reached a divided verdict, indicates to this Court that the jury thoroughly considered and weighed the evidence as to each individual defendant on each count, and did not base its decision on any outside influence. *See United States v. Sanders*, 962 F.2d 660, 674 (7th Cir. 1992) (fact that jury deliberated for several days and reached mixed verdict "supports a conclusion that the jury approached its responsibilities with discernment and care" despite extraneous influence). Moreover, there was significant evidence against the defendants in this case, and "much of it came from the defendants' own mouths in the form of video and audio recordings." *Id.* The Court also considers the highly conscientious manner in which the jurors fulfilled their obligations in this case, appearing punctually each day in the face of difficult Chicago winter weather, and listening attentively throughout the many days of this trial.[6] As this Court informed the jury after the trial was over, in the course of this Court's fourteen years on the bench, the Court has never seen a better jury. (Trial Tr. at 6382 ("You've been the best jury I've ever had the privilege of presiding with, always been here on a more than timely basis over an extended period of time, have done your work very carefully. It renews my spirits about the justice system . . . .").) In short, the Court finds no basis for concluding that the CSO's innocuous comment about being "civil" to one another so infected the deliberations as to

---

[6] For instance, the same day one of the jurors was excused when she broke her arm (notwithstanding her willingness to remain on the jury), another juror was involved in a car accident, in which her car slid off the road into a ditch as she attempted to drive through a snow storm to arrive at court. (Trial Tr. at 725-26.) After having her car towed, the juror took public transportation and arrived at court, allowing the trial to proceed. (*Id.*) This is just one example of the dedication shown by the jurors in this case.

19

deny the defendants a fair trial.

Second, according to the foreperson, the CSO did not make any statement to the jury about the defendants being in custody. (5/30/08 Tr. at 8, 9-10.) Even assuming such a statement was made, the jurors were made aware through the evidence presented at trial that the defendants were in fact in custody. (*Id.* at 19-20.) For instance, Benabe's counsel stated during opening statements that he had been in federal custody since September 2005. (Trial Tr. at 400.) There was testimony that Salazar was in custody (Trial Tr. at 4636-37), and during closing argument Salazar argued that he could not have been responsible for the May 2003 shooting involving the family of government witness Orlando Rivera because he was in custody since January 2003. (Trial Tr. at 5855-56.) Guzman stipulated that he had been in custody since September 2002. (Trial Tr. at 5373.) Susinka testified that he had been in custody since April 2002, and also elicited testimony on this point from his mother. (Trial Tr. at 458-59, 5946, 5256.) There was evidence presented to the jury that Juarez was a fugitive until he was arrested in April 2007. (Trial Tr. at 4652, 4932-4937.) There was also evidence presented that Delatorre was taken into custody in January 2003. (Trial Tr. at 2208-54, 2678-2716, 3040-56.)

Moreover, the Court instructed the jury that the Court had "excused Defendant Bolivar Benabe and Defendant Fernando Delatorre from being present in the courtroom for reasons that have nothing to do with the merits of the trial. The fact that Defendant Benabe and Defendant Delatorre were not present during the trial should not enter into your deliberations in any way." (Trial Tr. at 6116.) The Court also instructed the jury that the defendants were presumed innocent, that this presumption "continues during every stage of the trial and your deliberations on the verdict," and that the presumption "is not overcome unless from all the evidence in the

20

case you are convinced beyond a reasonable doubt that a defendant is guilty as charged." (*Id.*) The Court further instructed that "[t]he government has the burden of proving the guilt of each defendant beyond a reasonable doubt." (*Id.*) Jurors are presumed to follow the instructions they are given by the Court. *United States v. Corley*, 519 F.3d 716, 728 (7th Cir. 2008). Thus, even if this Court were to presume that the CSO had a conversation with the jurors in which she confirmed that the defendants were in custody, that information would not have fatally compromised the deliberations.

As for the third issue mentioned in AUSA Pope's letter, the foreperson testified that CSO McCauley did not say anything to the jurors about the verdict being "their verdict." (5/30/08 Tr. at 28.) Even assuming the CSO made this statement, this is a benign comment, tangential to the factual matters in dispute in this case. Such a statement also would have been consistent with the Court's instructions, as well as a statement made by the Court to the jurors during *voir dire*, indicating that they alone were the ultimate fact-finders in this case. (*See, e.g.,* Trial Tr. at 6112 ("Your first duty is to decide the facts from the evidence in the case. This is your job and yours alone."); Trial Tr. at 208 ("And let me just say it is your decision. There's nothing I will do during jury selection, during the trial, during my instructions that will be meant to convey any opinion on my part as to what I think the verdict should be. That is strictly your decision.").) For this reason, and based on all the other circumstances of this case described above, including the weight of the evidence against the defendants and the conscientious manner in which the jury conducted itself throughout these proceedings, the Court concludes that any comment about the verdict being "theirs" would not have fatally compromised the jury deliberations.

Defendants request that this Court bring in each individual juror to question them before

making any determination regarding whether the CSO's statements deprived them of a fair trial.[7] (R. 995, Salazar's Suppl. Mem. Regarding Jury Misconduct at 1.) The Court declines to do so, based on the testimony provided by the foreperson, as well as the other circumstances of this case outlined above. This Court employs a strict interpretation of Rule 606(b) in light of the significant policy considerations underlying this long-standing rule; these include verdict finality, maintaining the integrity of the jury system, encouraging frank and honest deliberations, and the protection of jurors from subsequent harassment by a losing party. *Tanner v. United States*, 483 U.S. 107, 120 (1987). As the Supreme Court has observed, were Rule 606(b) not in place, "[j]urors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *Id.* at 120; *see also United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (observing that courts should be "reluctant to haul jurors in after they have rendered a verdict and probe for potential instances of bias, misconduct or extraneous influences. . . . [P]ost-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless applications, increasing temptations for jury tampering and creating uncertainty in jury verdicts.").

Although the Court determined that an inquiry into the CSO's alleged comments was

---

[7] It is not entirely clear whether defendants are asking the Court to question all the jurors in connection with the CSO's statements, or only in connection with the issues pertaining to Juror 79. (*See* R. 995, Salazar's Suppl. Mem. Regarding Jury Misconduct at 1 ("Salazar believes that [the foreperson's] testimony coupled with the affidavit of Rachel Perez previously filed by Salazar requires this Court to question each of the other eleven jurors who deliberated in this case, ending with Juror 79."). Benabe has filed a *pro se* motion requesting that the jurors "be brought in and questioned at length" about the CSO issue and the issues pertaining to Juror 79. (R. 998, Benabe's *Pro Se* Notice Pertaining to Jury Bias at 3.) The issues pertaining to Juror 79 are addressed in Part II of this opinion.

necessary, at this point, the likelihood that any comment by the CSO polluted the jury's consideration of the case is "too slight to warrant hauling the [remaining] jurors before [the Court] for an examination." *Spano*, 421 F.3d at 606. "Lots of things mentioned in the jury deliberations are outside the record. Were the report of a juror who claims to have heard such a thing mentioned enough to require a hearing, few trials would end without a post-trial interrogation of the jurors; jury service would be even less popular than it is." *Id.* at 605. In resolving this issue, the Court has given the defendants the benefit of the doubt, and has assumed that the comments referenced in AUSA Pope's letter were made, even though the foreperson's testimony did not entirely bear this out. The Court applauds the government for bringing this matter to its attention even though it may have jeopardized verdicts that were generally favorable to the government. AUSA Pope's letter to the Court serves as a reminder that the goals of justice are not exclusively tied to merely winning a case. The Court, having presided over this case for nearly five years, is satisfied that the comments attributed to the CSO did not prejudice the jury's deliberations. For these reasons, the Court concludes that the defendants were not denied a fair trial based on any improper contact between the CSO and the jury, and denies the request to conduct further proceedings on this issue.

Finally, the Court does not want to overlook the dedicated service CSO McCauley rendered to the jury during this long and difficult criminal trial. It is obvious that this mutual undertaking, together with human nature, may lead to many communications between a CSO and a jury. However, in the future the Court will endeavor to ensure that CSOs receive proper training to ensure that any informal communications do not pass the somewhat gray line of improper comments to the jury.

## II.    Juror Misconduct

As an initial matter, although the post-trial motion alleging other forms of juror

misconduct was filed by Salazar, this Court previously ruled that any motion filed by any

defendant will apply to all defendants. (R. 125, Minute Entry.)  Benabe has filed his own

memoranda on the alleged juror misconduct, both through his counsel (R. 1001) and *pro se* (R.

998).  The Court applies the arguments raised by Salazar and Benabe to all of the defendants.

The defendants raise various arguments in support of their claim that juror misconduct

entitles them to a new trial. (R. 979, Salazar's Mot. for New Trial; R. 995, Salazar's Suppl.

Regarding Jury Misconduct; R. 998, Benabe's *Pro Se* Notice Pertaining to Jury Bias; R. 1001,

Benabe's Mem. on Juror Statements.)  Although the defendants essentially lump all the grounds

together, the Court finds it necessary to carefully parse the various grounds in light of the

constraints of Rule 606(b), which "severely restricts post-trial inquiry into a verdict." *Arreola v.*

*Choudry*, 533 F.3d 601, 607 (7th Cir. 2008).  After careful review, the Court views the motions

as raising four separate claims: (1) pre-existing bias of Jurors 79 and 384 in failing to disclose

their work at the Postal Service; (2) pre-existing bias of Juror 79 in failing to disclose her prior

knowledge of the case; (3) pre-existing bias of Juror 79 in failing to disclose that her son was a

former member of the Insane Deuces; and (4) improper extraneous contact between Juror 79 and

the defendants' family members during the trial.  The Court considers each claim separately.

### A.    Pre-existing Bias Of Jurors 79 & 384 Based On Their Failure To Disclose Their Work At The Postal Service

Before considering this claim on the merits, the Court must address the issue of waiver.

A defendant waives a claim of juror misconduct if he had the information underlying the claim

prior to the verdict and failed to raise it with the Court. *United States v. Gootee*, 34 F.3d 475, 479 (7th Cir. 1994); *United States v. Bolinger*, 837 F.2d 436, 438-39 (11th Cir. 1988). In other words, "[a] defendant cannot learn of juror misconduct during the trial, gamble on a favorable verdict by remaining silent, and then complain in a post-verdict motion that the verdict was prejudicially influenced by that misconduct." *United States v. Jones*, 597 F.2d 485, 489 n.3 (5th Cir. 1979).

This Court is concerned that this is precisely what occurred here. First, the timing of Ms. Perez's affidavit is suspicious, as it was filed almost a month after the jury reached its verdicts. (*See* R. 979, Salazar's Mot. for New Trial.) The motion asserts that counsel was apprised of the facts underlying the motion "shortly after the verdict was returned." (*Id.* at 2.) The Court does not doubt the veracity of counsel's assertion, but the bigger question is whether any of the *defendants* had this information prior to the verdict. Significantly, the information contained in Ms. Perez's affidavit is not the type of information that would have been discovered after the verdict. Rather, her affidavit indicates that this information was known to her during the trial. For instance, she states: "I attended the jury trial in the above referenced case and I recognized [Juror 79] as the same person that I worked with at the USPS at Fox Valley." (R. 979, Salazar's Mot. for New Trial, Ms. Perez's Aff. ¶ 4.) Given the apparent closeness of the defendants and their families (many of whom attended nearly every day of the 10-week trial), the Court finds it likely that this information was shared with one or more of the defendants prior to the verdict. *See United States v. Pelullo*, 105 F.3d 117, 127 (3d Cir. 1997) (upholding district court's determination that defendant possessed knowledge of alleged juror misconduct during the trial based on circumstantial evidence that individual who worked for defendant's father had

25

conveyed the information to him during trial).

Had this information been brought to the Court's attention prior to the verdict, the matter could have been easily remedied by inquiring of the juror and, if necessary, excusing her from the jury. As noted above, there were a total of seventeen jurors who heard all of the evidence in this case. If defendants had this information prior to the verdict, their failure to raise the issue with the Court waives their ability to seek a new trial on this ground. *Gootee*, 34 F.3d at 479. Thus, before this claim could proceed, the Court would need to question Ms. Perez under oath regarding precisely when she realized she may have known one of the jurors, and whether she shared this information with anyone else during the trial. Her testimony might then lead to the need to question others under oath about this same issue. However, before deciding whether such a use of public resources is warranted, the Court considers whether a further hearing on this claim is even necessary.

The Sixth Amendment guarantees a criminal defendant the right to an impartial jury. U.S. Const. amend. VI. The Due Process Clause independently requires the impartiality of any jury empaneled to try a case. *Morgan v. Illinois*, 504 U.S. 719, 726 (1992); *Arreola*, 533 F.3d at 605. "[D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). As the Supreme Court explained, "The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote." *Id.* Instead, "Due Process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to

26

prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

To obtain a new trial based on a claim of pre-existing juror bias, the defendant must show that the juror lied in response to a question in *voir dire*, and that a truthful answer would have been grounds to exclude the juror for cause. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555-56 (1984); *Warner*, 498 F.3d at 684. An honest mistake by a juror in answering a question during *voir dire* is not grounds for a new trial. *McDonough*, 464 U.S. at 555; *Warner*, 498 F.3d at 684. "To invalidate the result of a [ ] trial because of a juror's mistaken, though honest, response to a question, is to insist on something closer to perfection than our judicial system can be expected to give." *McDonough*, 464 U.S. at 555. The "cause" element is also an important aspect of the inquiry. As the Supreme Court observed, "A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination." *Id.* Further, unlike claims of extraneous contact with the jury, claims of pre-existing juror bias do not always require an evidentiary hearing. *Arreola*, 533 F.3d at 606; *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1141 (7th Cir. 1992). Instead, "[t]he tool for examining juror bias is *voir dire*." *Artis*, 967 F.2d at 1141.

Here, defendants assert that Jurors 79 and Juror 384 answered falsely when they failed to respond to the Court's questions about whether they had ever worked for any federal agency.

27

(Trial Tr. at 151-72.) As to Juror 79, in her questionnaire[8] she listed her employment history back more than eight years, and there is nothing indicating that she ever worked at the Postal Service; indeed, she lists a different employer for the period in 2005 referenced in Ms. Perez's affidavit. There is also no indication from the questionnaire that Juror 79 previously worked at a company called "BRK," as Ms. Perez asserts in her affidavit. (R. 979, Salazar's Mot. for New Trial, Ms. Perez's Aff. ¶ 5 ("I was friendly with [Juror 79] because we had previously worked together on an assembly line at a company called BRK, making fire extinguishers.").) Based on this information, it is possible that Ms. Perez has Juror 79 confused with someone else.[9] As for Juror 384, she revealed in her juror questionnaire that she presently works for the Postal Service, and so it is unclear why she did not respond affirmatively to this question during *voir dire*.

---

[8] Because the jury was anonymous in this case, the questionnaires completed by the jurors were kept confidential. Defendants request that the Court provide counsel with a copy of Juror 79's questionnaire. (R. 1017, Salazar's Reply at 1.) Out of concern for Juror 79's privacy and the integrity of the jury system, the Court denies this request. Nevertheless, the Court has included herein any information relevant to the claims raised by defendants. The Court states for the record that the questionnaire contains no information about Juror 79's son being in a gang, much less the Insane Deuces. Most of the questions on the questionnaire pertain to the corruption allegations at issue in *United States v. Rezko*, No. 05 CR 691, assigned to Judge St. Eve. Because the *Rezko* trial and the trial in this case were both scheduled to begin in February 2008, the jury department prescreened the jury pool for both cases with one questionnaire, and Judge St. Eve elected to use a questionnaire that was designed specifically for the *Rezko* trial; this questionnaire was filled out by all prospective jurors, including the jurors selected to serve in this trial.

[9] Although the foreperson testified that Juror 79 stated that she "knew of" one of the family members sitting in the audience during the trial and had seen one or more family members on the train and at a store near her home, there were many family members sitting in the audience during this trial, and it is not clear that Juror 79 was referring to Rachel Perez. Further, the foreperson clarified that Juror 79 did not say that she *knew* someone in the audience, but that she *knew of* that person. (5/30/08 Tr. at 31.) This conflicts with Ms. Perez's account that the two were friendly and had worked together at two different jobs. (*See* R. 979, Salazar's Mot. for New Trial, Ms. Perez's Aff. ¶¶ 3-8.)

Perhaps she thought that by including the information in her questionnaire she had already disclosed it. Nevertheless, even if the Court presumes that both of these jurors answered this question falsely, and did so on the basis of dishonesty rather than an honest mistake (which the Court finds unlikely), to succeed on their motion for a new trial defendants also must show that a correct answer to this question would have provided a valid basis to exclude these jurors for cause. *McDonough*, 464 U.S. at 555-56. Defendants have failed to make this showing.

Jurors are considered impartial as long as they can "conscientiously and properly carry out their sworn duty to apply the law to the facts of a particular case." *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988). A request to excuse a juror must be supported by "specified causes or reasons that demonstrate that, as a matter of law, the [juror] is not qualified to serve." *Gray v. Mississippi*, 481 U.S. 648, 653 n. 3 (1987). The decision whether to exclude a juror for cause is vested in the trial court. *Id.* In limited circumstances bias will be presumed and the juror must be excused, for instance, where the juror is related to one of the parties or has a financial interest in the outcome of the case. *United States v. Polichemi*, 219 F.3d 698, 704 (7th Cir. 2000). The fact that Jurors 79 and 384 previously worked or work for the Postal Service would not have provided a basis to exclude them for cause. The Supreme Court has long held that government employees are not barred from serving on a jury in a criminal case. *Dennis v. United States*, 339 U.S. 162, 171-72 (1950); *see also Polichemi*, 219 F.3d at 704 ("government employment alone is not, and should not be, enough to trigger the rule under which an employee is disqualified from serving as a juror in a case involving her employer"). Indeed, several jurors with connections to state and federal government agencies were seated in this case. (*See* Trial Tr. at 154, 164-65, 194, 295.)

Because this claim would ultimately fail under *McDonough* even if defendants could overcome the issue of waiver and establish that both jurors intentionally gave false answers in response to *voir dire* questions, the Court finds it unnecessary to conduct further proceedings on this claim. For the reasons stated above, this claim is denied.

### B. Pre-existing Bias Of Juror 79 Based On Her Alleged Knowledge Of The Case (Through Rachel Perez)

This claim triggers the same concern about waiver: The information contained in Ms. Perez's affidavit pertaining to Juror 79 suggests that the grounds for this claim were known to her during the trial. (R. 979, Salazar's Mot. for New Trial, Ms. Perez's Aff. ¶¶ 5-7.) If defendants were aware of these facts prior to the verdict, they have waived their right to raise this claim as a ground for seeking a new trial. *Gootee*, 34 F.3d at 479.

Assuming that there was no waiver, to obtain a new trial on this claim defendants would again have to show Juror 79 lied in response to a *voir dire* question, and that a correct answer would have provided a valid basis to exclude her for cause. *McDonough*, 464 U.S. at 556. As noted above, the background information provided by Juror 79 does not match the information described by Ms. Perez in her affidavit, and there is thus a distinct possibility that she is not the person Ms. Perez claims to have worked with. Assuming Juror 79 is the same person, defendants do not identify, nor can this Court discern, any question in this regard that Juror 79 answered falsely. The questions on this point were open-ended, and geared toward determining whether jurors could be fair in light of the nature of the case and parties involved. For instance, the Court named all the defendants being tried (which did not include Steven Perez or any other defendants in the second group), gave the name of the gang, and described the nature of the offenses. (Trial

30

Tr. at 27-28.) The Court then asked, "Is there anything that I've told you about just the nature of the charges that would prevent you from being a fair and impartial juror?" (Trial Tr. at 29.) Many potential jurors responded affirmatively, but Juror 79 remained silent. (*Id.* at 29-50.) Nothing in Ms. Perez's affidavit suggests that this "answer" to the Court's question was false. The jurors were also asked about their connections to Aurora: "Is there anyone here because of your proximity to [Aurora] feels uncomfortable serving as a juror in this case or feels that because of that, they will not be fair and impartial in this case?" (Trial Tr. at 195.) Again, Juror 79 did not respond, indicating that she could be fair and impartial. At no time during *voir dire* was it asked directly whether any of the potential jurors had ever met or knew of someone sitting in the audience. (*See* Trial Tr. at 17-333.)

This Court notes that it attempted to conduct the most thorough *voir dire* possible in this difficult case, screening out all potential jurors who made it clear that they did not want to serve on such a lengthy trial, and those who demonstrated a predilection for one side or an inability to decide the case based solely on the evidence for any number of reasons. The Court also gave the parties numerous opportunities to suggest *voir dire* questions to the Court; at no time did any of the seventeen attorneys[10] representing the parties suggest that the Court ask the questions referenced above. Based on the record, the defendants have failed to satisfy the first prong of the

---

[10] Defendants each had two appointed attorneys representing them in this case, all of whom were highly experienced criminal defense counsel, and the government was represented by three Assistant U.S. Attorneys.

*McDonough* test, and the Court therefore proceeds no further with this claim.[11]

## C. Pre-existing Bias Of Juror 79 Based On Her Failure To Disclose That Her Son Was A Former Member Of The Insane Deuces

To obtain a new trial on this ground, the defendants would again have to show that Juror 79 gave a false answer to a *voir dire* question, and that a correct answer would have provided a valid basis to exclude her for cause. *McDonough*, 446 U.S. at 556. The defendants do not identify, nor can this Court discern, any question Juror 79 answered falsely in this regard. During *voir dire*, at the request of the government, the Court inquired, "Have you had any relatives or close friends who have had any type of involvement in gangs?" (Trial Tr. at 263-64.) Juror 79 responded that her son was in a gang between the ages of 9 and 11.[12] (Trial Tr. at 265-66.) None of the many attorneys in the courtroom asked the Court to inquire which gang her son was involved with, even though the Court gave the attorneys a chance to pose follow-up questions

---

[11] Assuming defendants could show that Juror 79 did give some false answer, and did so based on dishonesty rather than an honest mistake, it is not clear that the knowledge she had would be a basis to exclude her for cause. Ms. Perez claims that Juror 79 once met Steven Perez, who was not tried with the first group of defendants although his name was mentioned at the trial, and was told by Ms. Perez that her cousin "Mondo" had been arrested. (R. 979, Salazar's Mot. for New Trial, Ms. Perez's Aff. ¶¶ 6-7.) This minimal information does not pertain to defendants' guilt or innocence. Courts have rejected impartial jury challenges where the juror had closer connections to the case than is alleged here. *See Enoch v. Gramley*, 70 F.3d 1490, 1506 (7th Cir. 1995) (no denial of right to impartial jury where court refused to strike juror for cause even though she was acquainted with a prosecution witness); *Porter v. Gramley*, 112 F.3d 1308, 1318 (7th Cir. 1997) (no denial of right to impartial jury even though juror was member of same church congregation as victim's mother); *United States v. Medina*, 161 F.3d 867, 871 (5th Cir. 1998) (defendant not deprived of Sixth Amendment right to impartial jury where juror was high school classmate of defendant and defense witness, and juror revealed to the court during the trial that he had some concerns about his personal safety).

[12] Juror 79's questionnaire indicates that as of January 2008, her son was 20 years old, so his gang involvement would have been approximately 10 or more years ago.

after Juror 79's testimony.[13] (Trial Tr. at 329.) Additionally, neither side sought to remove Juror 79 for cause, nor did either side use a peremptory challenge to remove her from the jury.[14] If the defendants wanted to know more about Juror 79's son, they should have inquired during *voir dire.*

Defendants argue that the foreperson's testimony about a note Juror 79 allegedly sent to this Court necessarily warrants a hearing. (R. 1017, Salazar's Reply at 2.) This Court disagrees. For the record, the Court states that it did not receive a note from Juror 79 at any point in these proceedings. Notes received by the Court from any juror or prospective juror have already been made part of the record. During the questioning of Juror 79 about her son's involvement in a gang, there is a reference in the transcript to a note received by the Court from one of the prospective jurors. (Trial Tr. at 265.) However, this note was not from Juror 79, but was instead from Juror 27, who was not selected to serve on the jury. (*See* Trial Tr. at 269.) Although it seems unlikely, the Court considers the possibility that Juror 79 did send a note, but that it was not received by the Court during the busy *voir dire* proceedings, which involved more than 100 potential jurors, many of whom sent notes to the Court.

Regardless, the Court is not convinced that the note is an appropriate basis upon which to

---

[13] This Court would have asked the question on its own had it occurred to the Court to do so. However, due to the multitude of issues being raised by the more than 100 potential jurors in the courtroom that day, the Court did not think to ask this question. The Court would absolutely have asked the question had the Court been requested to do so by one of the attorneys.

[14] As the Seventh Circuit has observed, even when a potential juror answers questions in a manner that might suggest bias, the lawyer might make a tactical decision not to strike the juror for cause: "The lawyer might feel that on balance the juror was more likely to vote for than against his client." *Cage v. McCaughtry,* 305 F.3d 625, 626-27 (7th Cir. 2002). The Court notes that Jurors 79 and 384 were among the few African-Americans to serve on the jury in this case.

question Juror 79 under Rule 606(b), which, as the Seventh Circuit has recognized, "severely restricts post-trial inquiry into a verdict." *Arreola*, 533 F.3d at 607. The purpose behind this Rule is to protect the jury system itself; the Rule permits inquiry into claims that tampering or other extraneous influence has tainted the proceedings, but precludes inquiry into internal jury matters. *Tanner*, 483 U.S. at 121. For instance, the Supreme Court held that no evidentiary hearing was required where there was evidence that the jurors may have consumed alcohol during their lunch breaks at various times throughout the trial, causing them to sleep in the afternoons. *Id.* at 113. Courts have applied this same rule to allegations of other potentially troubling, but *internal* jury matters, such as whether a juror was unable to hear the proceedings, was incompetent, or was inattentive during the trial. *See id.* at 119-20 (collecting cases). As the Supreme Court explained:

> There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior. It is not at all clear, however, that the jury system could survive such efforts to perfect it. Allegations of juror misconduct, incompetency, or inattentiveness, raised for the first time days, weeks, or months after the verdict, seriously disrupts the finality of the process. . . . Moreover, full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct.

*Id.* at 121. Here, the alleged note discussed by the foreperson and Juror 79 relates to Juror 79's internal thought processes during her jury service in this case, and not to any type of outside influence being brought to bear on the jury. *See United States v. Briggs*, 291 F.3d 958, 963-64 (7th Cir. 2002) ("Rule 606(b) is designed not only to protect the jurors from being pestered by lawyers after the verdicts are rendered, but also to protect the judicial process from efforts to

34

undermine verdicts by scrutinizing the jurors' thoughts and deliberations."). The Court considers the note to be an internal jury matter not subject to inquiry under Rule 606(b).

Defendants also argue that Juror 79's "intimate experience with the Insane Deuces" is an extraneous influence that necessarily requires an evidentiary hearing. (R. 1017, Salazar's Reply at 2.) This Court disagrees. A juror's prior experience "constitutes an intrinsic influence that does not require an evidentiary hearing, let alone a new trial." *Arreola*, 533 F.3d at 606. Jurors are expected to bring their common sense and experiences to bear in arriving at their verdict. *Id.* These are "the very human elements that constitute one of the strengths of our jury system." *Id.* Thus, "[a]lthough jurors may not go beyond the record to develop their own evidence, they are entitled to evaluate the evidence presented at trial in light of their own experience." *Id.* Based on *Arreola*, this Court does not view Juror 79's personal experiences involving her son to be an improper extraneous influence warranting an evidentiary hearing.

Defendants further argue that Juror 79 must be "presumed" biased because she did not disclose the information about her son without being asked. (R. 979, Salazar's Mot. for New Trial at 3-4.) Two of the cases cited in support of this argument were decided prior to the Supreme Court's opinion in *McDonough* and are no longer good law. (*See id.* at 3 (citing *United States v. Bynum*, 634 F.2d 768 (4th Cir. 1980), *abrogation recognized by Jones v. Cooper*, 311 F.3d 306 (4th Cir. 2002); *McCoy v. Goldston*, 652 F.2d 654 (6th Cir. 1981), *abrogation recognized by Urseth v. City of Dayton*, 680 F. Supp. 1084 (S.D. Ohio 1987).) A third out-of-circuit case relied on by defendants, *United States v. Perkins*, 748 F.2d 1519 (11th Cir. 1984), was decided a few months after *McDonough*, but is distinguishable because in that case it was established that the juror intentionally gave false answers during *voir dire*. As stated above, the

defendants have failed to make such a showing here. For all these reasons, the Court denies this claim.

### D.   Potential Extraneous Contact Between Juror 79 And Defendants' Family Members

The final issue is the potential extraneous contact between Juror 79 and the defendants' family members during the trial. When faced with a post-trial claim that extraneous contact has affected the jury's ability to be fair, the district court has discretion to determine whether, and to what extent, a hearing is necessary. *Spano*, 421 F.3d at 605. "[T]he extraneous communication to the juror must be of a character that creates a reasonable suspicion that further inquiry is necessary to determine whether the defendant was deprived of his right to an impartial jury. How much inquiry is necessary (perhaps very little, or even none) depends on how likely was the extraneous communication to contaminate the jury's deliberations." *Id.* No hearing will be necessary, for example, "where a comment heard by a juror was ambiguous and innocuous." *Warner*, 498 F.3d at 680; *see also Whitehead*, 263 F.3d at 722 ("The duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality.").

Here, there is no evidence before the Court that there was any type of improper "communication, contact, or tampering . . . about the matter pending before the jury" between Juror 79 and defendants' family members. *See Remmer*, 347 U.S. at 447. Assuming Ms. Perez's affidavit is accurate, she and Juror 79 saw each other in a store sometime around 2006, long before the jury was seated in this case. (R. 979, Salazar's Mot. for New Trial, Ms. Perez's Aff. ¶¶ 6-8.) The jury foreperson testified that Juror 79 reported recognizing one or more family

members on the train or at a store during trial, but there is no evidence that they spoke to each other or interacted in any way. (5/30/08 Tr. at 31-33.) This type of random, innocuous contact is not the type of extraneous influence, such as the attempted bribery of a juror or direct threats made to a juror, requiring a hearing under *Remmer*.[15] *See Whitehead*, 263 F.3d at 723 (no hearing required where potential extraneous influence was "not a third-party contact of the sort described in *Remmer*"); *United States v. Thibodeaux*, 758 F.2d 199, 202-03 (7th Cir. 1985) (no error where district court declined to conduct inquiry into juror reaction to an extraneous communication because, unlike *Remmer*, the comment heard by a juror was ambiguous and innocuous); *see also Wright v. Angelone*, 151 F.3d 151, 160 n.6 (4th Cir. 1998) (limiting *Remmer* to cases where defendant introduced "competent evidence that there was an extrajudicial communication or contact, and that it was more than innocuous interventions.").

The defendants argue that a hearing is necessary because Juror 79 "intentionally failed to bring to the Court's attention" her contact with defendants' family members despite questioning by this Court, but there is no basis in the record for reaching such a conclusion. (R. 995, Salazar's Suppl. Regarding Jury Misconduct at 8.) Although the Court questioned the jurors at

---

[15] The government argues that the conversation between Juror 79 and the foreperson is *per se* inadmissible under Rule 606(b). (R. 1011, Gov't's Resp. to Defs.' Mem. Regarding Juror Misconduct at 5-7.) This Court disagrees, since Rule 606(b) allows a juror to testify as to "whether any outside influence was improperly brought to bear upon any juror." Fed. R. Evid. 606(b). The foreperson's testimony about Juror 79's contact with the defendants' family members outside of court falls into this permissible category, although the Court concludes that it does not rise to the level of the type of contact requiring a hearing under *Remmer*. "Lots of things mentioned in jury deliberations are outside the record. Were the report of a juror who claims to have heard such a thing mentioned enough to require a hearing, few trials would end without a post-trial interrogation of the jurors; jury service would be even less popular than it is." *Spano*, 421 F.3d at 605.

the beginning and end of each break in an effort to discern whether there had been any improper extraneous contact, the Court's questioning was directed toward whether anyone had spoken with or tried to speak with the jurors about their jury service, or whether any of the jurors had spoken to anyone about the case. (*See, e.g.,* Trial Tr. at 418 ("Let me start out by asking has any juror been contacted by anyone about their jury service in this case? Has anyone tried to talk to you in any way?); *id.* at 1191 ("Has anyone tried to talk to you about this case at all?"); *id.* at 1350-51 ("Have any of you talked to anyone about this case, the case that's on trial?").) The Court did not inquire, nor did the parties ask the Court to, whether the jurors had seen anyone outside of court connected to the case, and Juror 79 may not have thought it necessary to disclose this information.[16] There is nothing before the Court to indicate that Juror 79 answered falsely when she did not respond to this Court's questions regarding whether anyone had tried to speak to her about her jury service in this case. The important fact is that the Court's continual questioning of the jurors about improper contacts throughout the trial ensured that no improper extraneous jury communications occurred during the trial.

This Court takes seriously the Supreme Court's admonition that "[t]he integrity of the jury proceedings must not be jeopardized by unauthorized invasions." *Remmer*, 347 U.S. at 229. Further, "[d]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally

---

[16] The Court notes that although steps were taken to avoid any extraneous contacts with jurors during the trial, it would be nearly impossible to prevent all contact between the jurors and the family members or others connected to the case in this public building, which sits in the middle of a large metropolitan area. As stated above, there were several family members who attended nearly every day of the 10-week trial. During most of the trial, with the exception of deliberations, the jurors were free to come and go as they wished during lunch and at the end of the day, and several of the jurors took public transportation to and from court every day.

acceptable." *Olano*, 507 U.S. at 738. Although Juror 79's sightings of the defendants' family members were unfortunate, the Court finds no basis to conclude that these random sightings would have caused Juror 79 to be biased against the defendants; to the extent the defendants suggest that the contact may have caused Juror 79 concern for her safety, one would surmise that such a concern would make her more likely to vote to acquit than to convict. The Court also considers the substantial weight of the evidence against the defendants, as well as the careful manner in which the jury fulfilled its duties in this case. For these reasons, the Court concludes that the defendants have failed to establish the necessity for a post-trial inquiry of Juror 79 based on the present record. Accordingly, the defendants' request for a new trial or, alternatively, an evidentiary hearing on this claim is denied.

## CONCLUSION

For the reasons stated herein, the defendants' motions for a new trial based on juror misconduct (R. 979, R. 995, R. 998, R. 1001) are denied.

Entered:

Judge Ruben Castillo
United States District Court

Dated: August 21, 2008

39



**U. S. Department of Justice**

*United States Attorney*
*Northern District of Illinois*

*Patrick C. Pope*
*Assistant United States Attorney*

*Dirksen Federal Building*
*219 South Dearborn Street, Fifth Floor*
*Chicago, Illinois 60604*

*Direct Line: (312) 353-1980*
*Fax: (312) 886-3502*

May 13, 2008

**BY HAND DELIVERY**
The Honorable Ruben Castillo
United States District Court
Northern District of Illinois
219 South Dearborn Street
Chicago, Illinois 60604

Re: <u>United States v. Delatorre, et al.</u>, 03 CR 90

Dear Judge Castillo:

I am writing to advise you that the government has recently learned, through an unsolicited, post-verdict conversation with Court Security Officer Kathy McCauley, that CSO McCauley had the below-described conversation(s) with jurors. The conversation between the government and CSO McCauley occurred on May 1, 2008, when two AUSAs, returning from lunch, were walking through the lobby of the courthouse and were approached by CSO McCauley.

First, CSO McCauley informed the AUSAs that, subsequent to contentious discussions by the jury during its deliberations, she informed the jurors that they needed to be civil with each other. The government does not know the specifics of this purported conversation.

Second, CSO McCauley informed the AUSAs that she confirmed, at some point, to at least one juror that the defendants were in custody, but further stated words to the effect that it was their verdict. The government also does not know the specifics of this purported conversation, including whether CSO McCauley was simply confirming a statement by one of the jurors about the custodial status of the defendants (which was fronted by defendants during the trial) or whether CSO McCauley was answering a question posed by one of the jurors. Nor does the government know whether this purported conversation occurred prior to or after the jury reached its verdicts.

The government will avoid any further conversations with CSO McCauley regarding United States v. Delatorre without leave of Court.

Very truly yours,

PATRICK FITZGERALD
United States Attorney

By: _____

Patrick C. Pope
Assistant United States Attorney
312-353-1980

cc:     Counsel for all defendants (via U.S. Mail)