# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 03 CR 90 |
| | ) | |
| FERNANDO DELATORRE, also known as | ) | Judge Ruben Castillo |
| "Fern," Fern-dog," and "Fernwood," | ) | |
| BOLIVAR BENABE, also known as "Jap," | ) | |
| JUAN JUAREZ, also known as "Ghost," | ) | |
| JULIAN SALAZAR, also known as "Mando," | ) | |
| "Comrade," "Conrad," Cuz," and "Cuzzo," | ) | |
| HAROLD CROWDER, also known as "H-Man,") | | |
| CHRISTIAN GUZMAN, also known as | ) | |
| "Mousey," and STEVEN SUSINKA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Presently before this Court are the defendants' post-trial motions seeking acquittal or a new trial. (R. 1005, 1012, 1014, 1015.) Also pending is the defendants' motion to reconsider the Court's previous denial of their post-trial motions alleging juror misconduct. (R. 1050.) For the reasons stated herein, the motions are denied.

## BACKGROUND

The facts underlying this long-running case involving members of the Insane Deuce Nation street gang ("Insane Deuces") have been set forth in numerous opinions and will not be repeated here, except as is relevant to the pending motions. *See, e.g., United States v. Delatorre,* ---F. Supp. 2d---, 2008 WL 3893772 (N.D. Ill. Aug. 21, 2008); *United States v. Delatorre,* 522 F. Supp. 2d 1034 (N.D. Ill. 2007); *United States v. Delatorre,* 508 F. Supp. 2d 648 (N.D. Ill. 2007);

*United States v. Delatorre*, 438 F. Supp. 2d 892 (N.D. Ill. 2006). In short, the government charged 16 members of the Insane Deuces with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962d, committing violent crimes--- including murder, attempted murder, solicitation to commit murder, robbery, witness tampering, and multiple narcotics offenses---in aid of the racketeering activity, and committing various narcotics and firearms offenses. (R. 227, Second Superseding Indictment ("Indictment").) One defendant, Akeem Horton, pled guilty (R. 380), and another defendant, Miguel Martinez, is a fugitive. The fourteen remaining defendants are: Fernando Delatorre ("Delatorre"), Miguel Rodriguez ("Rodriguez"), Steven Perez ("Perez"), Romel Handley ("Handley"), Steven Susinka ("Susinka"), Juan Juarez ("Juarez"), Christian Guzman ("Guzman"), Julian Salazar ("Salazar"), Bolivar Benabe ("Benabe"), Moriano Morales ("Morales"), Arturo Barbosa ("Barbosa"), Harold Crowder ("Crowder"), Brian Hernandez ("Hernandez"), Lionel Lechuga ("Lechuga").

Prior to trial, this Court severed the trial of the 14 defendants into two groups. *Delatorre*, 522 F. Supp. 2d at 1056. The first group, consisting of Guzman, Benabe, Juarez, Salazar, Delatorre, Crowder, and Susinka, were tried before this Court in a two-month trial that began on February 6, 2008.[1] (*Id.* at 1056-57.) During the trial, the jurors heard testimony from more than 100 government witnesses and 15 defense witnesses. (Trial Tr. at 346-5383.) Among the evidence presented by the government was the testimony of former Insane Deuces gang members

---

[1] The trial of the second group, consisting of Handley, Rodriguez, Barbosa, Lechuga, Morales, Hernandez, and Perez, was scheduled to begin on October 6, 2008, before Judge Leinenweber, who graciously volunteered to preside over the second portion of the case. (R. 906, Minute Entry.) The trial of these defendants originally began on April 2, 2008, but Judge Leinenweber had to declare a mistrial shortly after opening statements when several of the jurors expressed a desire to be removed from the jury. (R. 892, Minute Entry; 4/2/08 Tr.)

2

now cooperating with the government, including Orlando Rivera, a former high-ranking member of the Aurora Insane Deuces; undercover audiotapes of gang meetings; undercover videotapes; videotaped confessions of Delatorre; eyewitness identifications; and weapons, drugs, and gang-related documents recovered from the defendants' homes. On April 21, 2008, after deliberating for more than two weeks, the jury found the defendants guilty on all but three counts. (R. 921-929.) The jury found Guzman not guilty on Count Five, assault with a dangerous weapon on Victim C, and they were unable to reach a verdict on Count One, the conspiracy count, against Crowder and on Count Nine, a narcotics count, against Susinka. (R. 921, 928, 929.) The Court declared a mistrial on these latter two counts. (R. 922, 943.) After further proceedings and two more days of deliberations, on April 23, 2008, the jury returned its verdict on Phase II, the special factual findings pertaining to sentencing, and Phase III, pertaining to forfeiture. (R. 930-59.)

Presently pending before the Court are post-trial motions filed by the defendants alleging numerous reasons why they are entitled to acquittal under Federal Rule of Criminal Procedure 29, or alternatively, a new trial under Federal Rule of Criminal Procedure 33. (R. 1005, Delatorre's *Pro Se* Mot. for Reversal & New Trial ("Delatorre's *Pro Se* Mot."); R. 1012, Juarez's Mot. for Judgment of Acquittal Or, In the Alternative, Mot. for New Trial ("Juarez's Mot."); R. 1014, Joint Mot. of Delatorre, Benabe, Juarez, Salazar, Crowder, Guzman & Susinka for Judgment of Acquittal or New Trial ("Joint Mot."); R. 1015, Benabe's *Pro Se* Mot. to Vacate the Verdict Based on Trial in Absentia ("Benabe's *Pro Se* Mot.").) These motions are now fully briefed. (*See* R. 1030, Gov't's Consol. Resp. to Defs.' Post-Trial Mots. ("Gov't's Resp."); R. 1046, Delatorre's Response to Gov't's Consolid. Resp. to Defs.' Post-Trial Mots. ("Delatorre's *Pro Se* Reply"); R. 1048, Defs.' Joint Reply to Gov't's Consolid. Resp. to Def.'s Post-Trial

3

Motions ("Joint Reply").)

## ANALYSIS

### I. Sufficiency of the Evidence

The defendants first argue that there was insufficient evidence to support their convictions, specifically as to the RICO enterprise and the drug trafficking. (R. 1014, Joint Motion at 1-2.) It is a "daunting task" for a defendant to prevail on a sufficiency of the evidence claim. *United States v. Cochran*, 534 F.3d 631, 633 (7th Cir. 2008). In reviewing the sufficiency of the evidence, this Court must view the evidence in the light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* In making this determination, the Court does not "weigh the evidence or assess the credibility of the witnesses." *United States v. Orozco-Vasquez*, 469 F.3d 1101, 1106 (7th Cir. 2006).

The Court finds the evidence in this case more than sufficient to support the convictions. The government in this case presented testimony from 100 witnesses, along with undercover video and audio recordings, documentary evidence, weapons, and narcotics. The evidence established that the Insane Deuces are a well-established street gang operating throughout Northern Illinois, with principal factions in Chicago, Elgin, and Aurora, and that its members, which include the defendants, engaged in acts of violence against rival gang members and others; the gang was an ongoing organization with members that functioned as a continuing unit, with a definite structure and distinct roles for its members; the gang members engaged in drug trafficking to benefit the gang; and the gang operated a "caja" system, in which gang members had access to a common fund of drugs, guns and money.

4

The defendants suggest that the evidence was insufficient because the government's principal witness, Orlando Rivera, a former high-ranking member of the Aurora Insane Deuces, "was thoroughly impeached." (R. 1014, Joint Motion at 2.) To obtain a new trial based on the credibility of a witness, the defendants must show that the witness's testimony was "incredible as a matter of law," either because it would have been physically impossible for the witness to observe what he described, or because it would have been impossible under the laws of nature for the event described by the witness to have occurred. *United States v. Ortiz*, 431 F.3d 1035, 1039 (7th Cir. 2005). The defendants do not come anywhere near meeting this high standard. Instead, they rely on discrepancies in Rivera's account and his motive for providing testimony favorable to the government---evidence that is insufficient to establish that his testimony was incredible as a matter of law. *Id.* "When a jury has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it, we have no basis to interfere, as the jury is the final arbiter on such questions." *United States v. Alcantar*, 83 F.3d 185, 189 (7th Cir. 1996). For these reasons, the Court rejects the defendants' argument.

Guzman separately argues that there was insufficient evidence against him on the racketeering charge. (R. 1014, Joint Mot. at 2-7.) The Court finds no merit to this argument. First, there was significant evidence of Guzman's membership in the Insane Deuces, including the testimony of multiple cooperating gang members, the testimony of Aurora Police Detective Jeff Wiencek, and the tape of a July 5, 2002, gang meeting. There was also significant evidence that a primary responsibility of an Insane Deuces gang member was to kill rival gang members, and that one of the ways to advance within the gang was to commit violence against rival gang members. The evidence also established that Guzman personally committed at least two acts of

5

racketeering, specifically, the attempted murder of Latin King gang member Shermain Shamley on July 18, 2002, and the murder of David Lazcano (who was mistakenly thought to be a Latin King) on August 11, 2002. Guzman challenges the eyewitness testimony identifying him as the shooter in these incidents, but the fact remains that these eyewitnesses identified Guzman, and it is not the role of this Court to "weigh the evidence or assess the credibility of the witnesses" in ruling on the defendants' sufficiency of the evidence claim. *Orozco-Vasquez*, 469 F.3d at 1106. Moreover, there was other evidence linking Guzman to Lazcano's murder, including the testimony of former gang member Rivera. In short, the Court finds sufficient evidence to support Guzman's convictions.

Susinka separately argues that the government failed to prove that he personally committed two predicate acts charged in the indictment. (R. 1014, Joint Mot. at 7-10.) However, Susinka was charged with *participating* in a RICO conspiracy under 18 U.S.C. § 1962(d), not with a substantive RICO violation under 18 U.S.C. § 1962(c). Unlike a substantive RICO violation, in a RICO conspiracy case the government does not have to prove particular predicate acts were committed by a particular defendant. *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991); *Delatorre*, 522 F. Supp. 2d at 1045. Instead, the government need only prove that the defendant agreed that some member of the conspiracy would commit two or more predicate acts of racketeering. *See United States v. Salinas*, 522 U.S. 52, 63-65 (1997). The government proved that in this case. There was substantial evidence presented at trial that one of the primary missions of the Insane Deuces was to kill rival gang members, that the members of the gang, including Susinka, knew that primary mission and agreed to that objective, and that multiple acts of violence were committed in furtherance of that mission. The Court therefore

6

rejects Susinka's argument.

Susinka also argues that there was insufficient evidence to show that he joined the charged conspiracy or adopted the overall goals of the Insane Deuces. (R. 1014, Joint Mot. at 9-10.) The Court rejects this argument as well. There was substantial evidence showing that Susinka was a member of the Insane Deuces, including evidence that: he was arrested several times with other Insane Deuces gang members; he was the getaway driver in the murder of Robert Perez, which was ordered by the gang leadership and committed by Insane Deuces gang members; he was arrested on March 13, 2002, with a "nation" gun, which had been used three days earlier in the attempted murder of two suspected Latin King gang members; he attended and was photographed at a gang meeting on April 10, 2002; he was arrested with another "nation" firearm on April 16, 2002; and he sold drugs as an Insane Deuces gang member. Although Susinka's defense theory, and his testimony at trial, was that he was not a member of the Insane Deuces, the jury chose to reject this theory. There was substantial evidence from which the jury reasonably concluded that Susinka was a member of the charged conspiracy.

Benabe separately argues that the evidence against him was insufficient because he was too far geographically removed from the criminal acts that occurred in Aurora, and there was no evidence that he had any control over the Aurora Insane Deuces who committed these criminal acts. (R. 1014, Joint Mot. at 10.) This argument is misguided, since Benabe was convicted of *participating* in a racketeering conspiracy and a drug conspiracy. In that regard, there was substantial testimonial and documentary evidence that Benabe was a key participant in both conspiracies, and that for several years he was the highest ranking Insane Deuces gang member outside of prison, responsible for overseeing the operations of all factions of the gang throughout

7

Northern Illinois, including Aurora. Again, the Court finds substantial evidence from which the jury reasonably concluded that Benabe was a member of the charged conspiracy.

For all of these reasons, the Court rejects defendants' arguments regarding the sufficiency of the evidence.

## II. Severance

The defendants next claim that they should be granted a new trial pursuant to Rule 33 because they were unfairly prejudiced by a joint trial. (R. 1014, Joint Mot. at 10-13.) The severance issue was exhaustively briefed by all parties prior to trial (*see, e.g.,* R. 151, 161, 329, 348, 356, 365, 403, 457, 461, 474), and this Court previously issued a comprehensive opinion explaining its reasons for severing the case into two trials. *Delatorre*, 522 F. Supp. 2d at 1034-60. After careful consideration of the competing interests at stake, and the parties' various severance proposals, this Court concluded that trying all fourteen defendants in one single consolidated trial would be prejudicial to the defendants, but that the defendants' proposed severance plans were unworkable and would require unnecessary duplication of the evidence. *Id.* at 1034-57. Without recounting all of the reasons previously articulated, the Court continues to view its severance plan dividing the defendants into two groups as the best possible approach to this difficult and complex case.

In their motion, the defendants argue that they should not have been jointly tried "because of the overwhelming number of discrete acts which the jurors were required to evaluate" as part of the charged conspiracy, rendering the jury unable to sift through the evidence to determine who was responsible for each violent act proven at trial. (R. 1014, Joint Mot. at 12.) The Court rejects this argument. The defendants were charged with participating in a RICO

8

conspiracy, which, by its very nature, involved multiple violent acts, including murder, attempted murder, witness tampering, and drug trafficking. (R. 227, Indictment.) The evidence of these acts was necessary to prove the existence of the enterprise, the pattern of racketeering activity, and the defendants' involvement in the conspiracy. The mere fact that racketeering conspiracies may involve spillover evidence regarding predicate crimes committed by other defendants does not require each defendant to be tried separately, since "every member of a conspiracy is substantively culpable for other conspirators' acts within the scope of the conspiracy." *United States v. Hoover*, 246 F.3d 1054, 1057-58 (7th Cir. 2001); *see also United States v. Goines*, 988 F.2d 750, 759-60 (7th Cir. 1993) ("The government, however, may prosecute coconspirators of every level together, from the street dealer to those who run the show. . . . [M]embers of a conspiracy run the risk of prosecution for every crime committed in furtherance of the conspiracy, even crimes in which they did not directly participate. As long as the crimes were within the scope of the conspiracy they joined, they will be held liable. This rule is fair because every member of the conspiracy benefits from the contribution of the others. "). Moreover, the fact that the jury reached a mixed verdict in this case is a strong indication that the jurors were able to parse through the evidence to determine the culpability of each individual defendant. For these reasons, the Court rejects this argument.

Guzman separately argues that he was prejudiced by a joint trial because of the disparity of the evidence against him and the other defendants. (R. 1014, Joint Mot. at 11.) This Court disagrees. The evidence established that Guzman was an integral participant in the charged conspiracy, and that during a two-month period in 2002, he committed one murder and two attempted murders on behalf of the Insane Deuces. Again, the jury's careful deliberations and

9

mixed verdicts in this case indicates to this Court that the jury carefully parsed through the evidence to determine the culpability of each individual defendant on each count. Indeed, the jury found Guzman not guilty on Count Five of the Indictment. (R. 929.) For these reasons, the Court concludes that Guzman was properly tried with the other defendants.

Next, Juarez, Salazar, Guzman, and Susinka argue that they were prejudiced by their joinder with Delatorre and Benabe, who were absent from the trial, which they claim "inevitably tainted the trial." (R. 1014, Joint Mot. at 12.) As detailed more fully in Section VII below, Benabe and Delatorre were excused from the trial because of their disruptive conduct, in an effort to protect the remaining defendants from being prejudiced by their conduct during trial. This Court instructed the jury that they were not to consider the absence of these defendants, both during voir dire and at the close of the evidence. (Trial Tr. at 73-84, 6116.) The Court also instructed the jury on the government's burden of proof and the presumption of innocence enjoyed by all defendants through all stages of the trial. (Trial Tr. at 6116-18.) Jurors are presumed to follow the Court's instructions. *United States v. Wantuch*, 525 F.3d 505, 516 (7th Cir. 2008). The fact that the jury took more than two weeks to deliberate and ultimately reached mixed verdicts is a strong indication to this Court that the jury carefully considered the evidence against each individual defendant. For these reasons, the Court rejects this argument.

Finally, Benabe, Juarez, Salazar, Delatorre, and Susinka claim that the trial was tainted by Guzman's outburst during closing argument. (R. 1014, Joint Mot. at 12.) During the government's rebuttal argument, government counsel was discussing an eyewitness's identification of Guzman and, based on the expression on Guzman's face, stated that Guzman "thinks this is funny." (Trial. Tr. at 6086.) Guzman responded, "I don't think nothing's funny. I

10

think you're making this whole case up. That's what I think you're doing." (*Id.*) The Court
instructed Guzman to be quiet, but he continued, "You fabricated this whole case. You're sitting
up there lying through your teeth, without showing respect for the jurors." (*Id.*) The Court
immediately took a recess and had the jury removed from the courtroom. (*Id.*) After being given
time to compose himself, Guzman apologized for his behavior and promised the Court that he
would not make any further outbursts if permitted to remain in the courtroom. (*Id.* at 6088.)
Notwithstanding the government's request that Guzman be removed for the remainder of the
trial, the Court permitted him to return based on his representations to the Court. (*Id.*) Guzman
sat quietly through the remainder of the trial and made no further outbursts in the presence of the
jury. During jury instructions, this Court instructed the jury, "You should not consider any in-
court action or in-court statement by defendant Christian Guzman in any way in arriving at your
verdicts. These actions and statements are not evidence against Defendant Guzman or any other
defendant." (Tr. at 6118.) The jury is presumed to have followed this instruction. *Wantuch*, 525
F.3d at 516.

This case is distinguishable from *United States v. Mannie*, 509 F.3d 851 (7th Cir. 2007),
relied on by the defendants. In that case, Mannie's co-defendant engaged in repeated outbursts,
lengthy diatribes from the witness stand, and at one point engaged in a "violent courtroom brawl"
with his attorney. *Id.* at 857. The Seventh Circuit found this situation "so beyond the pale" that
prejudice against Mannie had to be presumed. *Id.* at 856-57. The Court reiterated throughout the
opinion, however, that this situation was unusual, and that normally curative instructions are the
appropriate means of dealing with an outburst by a co-defendant. *Id.* This case does not present
the type of "beyond the pale" facts at issue in *Mannie*. Given the limited nature of Guzman's

11

outburst, in which he merely expressed his view that the government's evidence against him was false, and the fact that he returned to the courtroom and was compliant during the remainder of the trial, the Court concludes that no prejudice was suffered by any defendant. Instead, there is every reason to believe that the jury followed the Court's curative instruction, in light of the jury's careful deliberations and jury verdicts ultimately reached in this case.

## III.    Evidence Against Benabe

### A.    Motion to Suppress

Benabe argues that the Court erred in denying his motion to suppress evidence recovered from his residence. (R. 1014, Joint Mot. at 13.) This issue was briefed by the parties prior to trial (R. 383, 391, 392), and this Court thoroughly addressed the issue in an opinion denying Benabe's motion. (R. 424, Mem. Opinion & Order.) There are no new arguments in the post-trial motion, and for the reasons previously articulated, the Court finds no basis to grant a new trial on this ground.

### B.    Introduction of Firearms

Benabe next argues that the Court erred in admitting into evidence two handguns recovered from his apartment, arguing that the guns were "insufficiently relevant" and "unduly prejudicial." (R. 1014, Joint Mot. at 14.) Federal Rule of Evidence 403 allows the district court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." Fed. R. Evid. 403. This Court previously determined that the handguns were admissible, and the evidence at trial further bore out the relevance of these weapons. The evidence at trial established that Benabe was a high-ranking member of the Insane Deuces and was responsible for running the gang outside of prison. Given Benabe's position with the gang,

12

and the evidence that the Insane Deuces engaged in repeated acts of violence (mainly shootings) against rival gang members, the handguns were highly relevant and were not unduly prejudicial within the meaning of Rule 403. Thus, the Court rejects Benabe's argument.

## C. Benabe's Bill of Particulars

Benabe next argues that this Court erred in denying his pre-trial "Motion to Enforce the Bill of Particulars." (R. 1014, Joint Mot. at 14.) Benabe initially moved for a Bill of Particulars on September 17, 2007, and the Court granted that request. (R. 442, 489.) The government thereafter filed its written response to Benabe's motion, which included a description of the government's theory of Benabe's criminal culpability, as well as a list of examples of the evidence the government intended to introduce at trial to prove Benabe's participation in the charged conspiracy. (R. 553.) Benabe was not satisfied with this response and filed a "Motion to Enforce the Bill of Particulars." (R. 663.) The Court denied this motion. (R. 676.) As this Court previously concluded, a Bill of Particulars is not a vehicle to obtain a fact-by-fact detailing of the government's evidence; this is particularly true here where the government tendered voluminous discovery to the defendants during the course of this case. Without any new or compelling arguments by Benabe on this issue, the Court will adhere to its previous ruling, and finds no basis to grant a new trial on this ground.

## V. Guzman's Motion for Pretrial Witness List

Guzman argues that he is entitled to a new trial because the Court improperly denied his motion for pretrial discovery of the government's witness list. (R. 1014, Joint Mot. at 14-19.) Guzman's request for additional pretrial discovery was thoroughly briefed before trial (R. 589, 610), and this Court denied his request. (R. 638.) Guzman now argues that without the

13

information he sought in his pretrial motion, he could not adequately prepare for cross-examination of various government witnesses. (R. 1014, Joint Mot. at 14-19.) The Court finds this argument without merit. The government provided defendants with unredacted copies of all cooperating gang member statements and testimony more than a year in advance of trial. More than two years in advance of trial, the government provided the defendants with copies of police reports, ATF reports, and grand jury statements of civilian witnesses, with identifying information of those witnesses redacted to protect their safety. Throughout trial, the government provided to defense counsel one week in advance the list of upcoming witnesses and complete copies of their statements, including their names. None of the defense attorneys requested additional time to prepare for cross-examination of civilian witnesses.[2] Guzman's counsel extensively cross-examined the civilian eyewitnesses about their identifications of Guzman. In light of the record, the Court finds no basis to grant a new trial on this ground.

## VI.  *Santiago* Proffer

The defendants next argue that this Court erred in denying their motion for a more specific *Santiago* proffer.[3] (R. 1014, Joint Mot. at 19-20.) The *Santiago* proffer in this case

---

[2] Guzman himself raised an issue of wanting to call additional witnesses in his defense. The Court exhaustively explored this issue with Guzman's attorneys, who explained on the record their reasons for deciding not to call the witnesses identified by Guzman. (Trial Tr. at 4846, 4865-77.)

[3] Under *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), *overruled on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987), the statements of unindicted co-conspirators are admissible as non-hearsay if the government proves prior to trial that a conspiracy existed, that the defendant and the declarant were members of the conspiracy, and that the statements were made during the course and in furtherance of the conspiracy. *Wantuch*, 525 F.3d at 511 n. 3. The admissibility of the co-conspirator statements is subject to the trial court's "later determination that the government proved these foundational elements at trial." *Id.*

14

spanned 140 pages, most of which was single-spaced, and the government set forth an extensive overview of the evidence it planned to introduce at trial, including summarizing the co-conspirator statements it intended to offer. The government incorporated by reference various undercover recordings and cooperating gang member statements, all of which were provided to the defendants well in advance of trial. The Court denied the defendants' motion for a more specific proffer, and advised them that they need to object at trial to any statements they believed were not co-conspirator statements. (R. 638.) Notably, the defendants do not point to any statement that was erroneously admitted at trial as a co-conspirator statement. Based on the record, the Court finds no basis to grant a new trial on this ground.

## VII. Exclusion of Benabe and Delatorre From The Courtroom

Next, Benabe and Delatorre argue that this Court denied them a fair trial by excluding them from the courtroom during trial. (R. 1014, Joint Mot. at 20-24; R. 1005, Delatorre's *Pro Se* Mot.; R. 1015, Benabe's *Pro Se* Mot.) A criminal defendant's right to be present at every stage of a trial is rooted in the Confrontation Clause of the Sixth Amendment, and is also protected by the Due Process Clause of the Fifth and Fourteenth Amendments. *Illinois v. Allen*, 397 U.S. 337, 338 (1970); *United States v. Smith*, 230 F.3d 300, 309 (7th Cir. 2000). This right has also been codified in Federal Rule of Criminal Procedure 43. *See* Fed. R. Crim. P. 43(a).

While the right to be present during trial is one of the most basic rights afforded to a criminal defendant, this right is not absolute. *Allen*, 397 U.S. at 342-43. The defendant can lose the right to be present if, "after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful that his trial cannot be carried on with him in the

15

courtroom." *Id.* at 343; *see also* Fed. R. Crim. P. 43(c)(1)(C) (the defendant waives his right to be present "when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom."). Once lost, the right can be reclaimed "as soon as the defendant is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Allen*, 397 U.S. at 343. The Supreme Court has recognized that removing an unruly defendant, though unfortunate, will sometimes be necessary: "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country." *Allen*, 397 U.S. at 343. Thus, a defendant's "flagrant disregard" of "elementary standards of proper conduct should not and cannot be tolerated." *Id.* A trial judge confronted with "disruptive, contumacious, stubbornly defiant defendants" must have "sufficient discretion to meet the circumstances of each case." *Id.* The Supreme Court has identified three constitutionally permissible ways for the trial judge to handle such a defendant: (1) bind and gag him; (2) cite him for contempt; or (3) have him removed from the courtroom "until he promises to conduct himself properly." *Id.* at 343-44.

Benabe and Delatorre argue that they were improperly excluded from the trial because they "were never disruptive nor disrespectful during pre-trial proceedings." (R. 1014, Joint Mot. at 21.) The Court finds this characterization, at best, revisionist history. The Court considers the conduct of Benabe and Delatorre, as reflected in the record.

Beginning in October 2007, approximately four months before the trial was scheduled to begin, Delatorre (who was represented by two highly experienced defense attorneys), began inundating the Court with *pro se* motions, affidavits, petitions, notices, letters, and other filings.

16

(*See, e.g.,* R. 470, 471, 493-99, 522, 578, 607, 608, 612-15.) In each filing, Delatorre raised essentially the same arguments, that this Court lacked jurisdiction over him because: (1) the United States Criminal Code was never properly enacted and is thus void; (2) he is a "sovereign" "flesh and blood man," not the "fictional" entity "FERNANDO DELATORRE" charged in the Indictment; and (3) United States district courts do not have jurisdiction to enforce federal criminal law outside of the District of Columbia, Puerto Rico, Virgin Islands, and federal enclaves and territories. *Delatorre,* 2008 WL 312647, at *1. Around this same time, Delatorre also began routinely disrupting court proceedings, speaking out of turn, interrupting this Court, and ignoring direct requests and questions from this Court. *Id.* at *3. Many times Delatorre would orally reiterate the arguments raised in his *pro se* filings, demanding that this Court answer the questions posed in those filings, and accusing the government of illegally detaining him.[4] *Id.* Shortly before trial, Benabe (who was also represented by two experienced defense attorneys) also began raising similar "jurisdictional" challenges in multiple *pro se* filings. (*See* R. 741-46.)

In an effort to put these purported "jurisdictional" issues to rest, this Court issued an opinion fully explaining why these arguments were unavailing under the law of the Seventh Circuit and the Supreme Court. *See Delatorre,* 2008 WL 312647, at *1-2. The opinion also

---

[4] After observing Delatorre's conduct and demeanor during court proceedings, the Court found it necessary to order an examination of his mental competency. (R. 541.) Delatorre was subsequently found to be fully competent. This Court surmises that Delatorre may have hoped that his outbursts would cause the Court to sever his trial from that of the other defendants. The prospect of a joint trial may have concerned Delatorre, given that he cooperated with law enforcement early in this case and provided statements inculpating himself and others in various criminal acts. Delatorre's videotaped statements were offered as evidence by the government at trial.

expressly warned that the defendants' failure to obey this Court's orders and exercise self-control during court proceedings could result in exclusion from the courtroom during jury selection or trial. *Id.* at *3-4.

At a status hearing on January 31, the day after the opinion was issued, Delatorre began speaking out of turn almost immediately after the case was called, again raising his jurisdictional arguments. (1/31/08 Tr. at 5.) The Court responded, "[I]t is my firm decision, after carefully evaluating all of the factors that I need to evaluate to ensure that there is a fair trial, any further disruptions of any kind by any defendant are not going to be tolerated by this Court. I will not sever any defendant. I will use my authority to have that defendant watch all or any portion of the trial proceedings at the [Metropolitan Correctional Center]. That is my firm decision." (1/31/08 Tr. at 6.) The Court thereafter inquired of each defense attorney whether they had received a copy of the Court's opinion and shared it with their clients. (*Id.* at 6-7.) Delatorre's counsel stated that Delatorre had refused to accept a copy of the opinion from him. (*Id.* at 6.) Benabe's counsel stated that she attempted to visit Benabe in the lock-up but he refused to see her, and so she gave him a copy of the opinion when he arrived in court that morning. (*Id.*) Several other defense counsel stated that they had not yet had an opportunity to review the opinion with their clients. (*Id.* at 7.) Based on these representations, the Court set one final status hearing for February 5, and directed that by that date every defendant should have read the opinion. (*Id.*) The Court further advised:

> On Tuesday, I intend to ask each defendant if they intend to speak during the trial without my court permission. Any defendant who responds in the affirmative will be held at the MCC from day one of the trial and will see the trial from a seat at the MCC. I will not allow any defendant to prejudice any of the other defendants on

18

trial before any of the prospective jurors. I want to make this as
clear as I can. I've taken the time to write this opinion because I
believe in the sincerity of different views held by defendants. . . .
But any further attempts by Mr. Delatorre or any defendant to
disrupt this trial will have to be interpreted by me as a willingness
on the part of that defendant to watch the trial at the MCC, and I
will make arrangements to ensure that happens. My preference is,
when I look at this courtroom, I see a lot of competent attorneys
who are good at putting the government to its burden of proof. The
government's burden of proof will be stressed throughout this trial
of beyond a reasonable doubt for any allegations. I would think the
defendants would be served by having a neutral jury evaluate
whether or not the government can meet that burden of proof after
a trial. Anything less than that is just a waste of the resources of
our federal criminal justice system, and I, as indicated by the Court
of Appeals in the Mannie decision, in other decisions that they
issued with regard to Mr. Warner, Mr. Ryan, have really obligated
me to take affirmative steps to control what happens in this
courtroom, and I certainly will honor what my Court of Appeals
wants me to do. That's all I'm going to say with regard to that
issue, so we will have another status Tuesday.

(1/31/08 Tr. at 7-8.) The Court thereafter addressed numerous other issues pertaining to the trial.

(*Id.* at 8-19.) In the midst of a discussion about the clothing to be worn by the defendants during

the trial, Benabe again began asserting jurisdictional arguments similar to those already rejected

by the Court. (*Id.* at 19.) The Court responded, "Mr. Benabe, all I can do is request that you read

the opinion I issued yesterday. As I understand it, you haven't had a chance to read that, is that

correct?" (*Id.*) Benabe responded, "And probably will not do so, Judge, because I'm a born

sovereign." (*Id.*) He thereafter demanded that the Court provide him with "documented

evidence" explaining how the Court "presumes to have jurisdiction over a born sovereign flesh-

and-blood human being." (*Id.* at 19-20.) The Court stated that it would not continue to debate

these issue with Benabe, and advised again, "On Tuesday, I will ask you whether or not you're

going to make statements without my court permission during the trial. If you give me no answer

19

or if you say that you will, I will hold you at the MCC while the trial proceeds . . . ." (*Id.* at 20.)
The Court further stated: "I really want to emphasize this to all defendants, talking to you person
to person, not judge to defendant. All you're going to do is hurt yourself in the eyes of the jury. I
would really urge you not to do that." (*Id.*) Benabe thereafter continued to interrupt the Court
and to assert his jurisdictional arguments. (*Id.* at 20-21.) The Court directed the marshals to
remove Benabe from the courtroom. (*Id.* at 21.) Shortly thereafter, Delatorre began reasserting
his jurisdictional arguments. (*Id.*) The Court directed the marshals to remove Delatorre from the
courtroom. (*Id.*) Delatorre continued to speak and to disrupt the proceeding until he was
physically removed from the courtroom. (*Id.*)

The Court held one final status hearing on February 5, the day before the trial was
scheduled to begin. (2/5/08 Tr.) The Court began by asking the attorneys whether the
defendants had been provided with copies of this Court's opinion. (2/5/08 Tr. at 6-7.)
Delatorre's attorney stated that he had attempted to give Delatorre a copy but that he had refused
to accept it. (*Id.* at 7.) The other attorneys indicated that they had provided copies of the opinion
to their clients. (*Id.* at 6-8.) The Court then stated, "Let me also add to it that I will consider
from this point on---and I've been patient to this point---that any outbursts by a defendant from
this point on without the Court's permission, I will consider contempt of court. . . . Now, my
priority is simply to allow both sides to have a fair trial and to have the government put to its
burden of proof. That is my priority. So I do not want to go down this road, but I feel compelled
to proceed with the questioning of each defendant in order to ensure that tomorrow's proceeding
and every proceeding thereafter takes place in an orderly fashion in compliance with the *Mannie*
opinion." (*Id.* at 9.) The Court then proceeded to question each defendant individually regarding

whether they intended to speak without the Court's permission during the trial. (*Id.* at 9-20.) Susinka, Juarez, Guzman, Crowder, and Salazar all responded that they did not intend to speak without the Court's permission during trial. (*Id.*)

When the Court questioned Benabe, however, he again began asserting his jurisdictional arguments. (*Id.* at 10-11.) The Court advised Benabe that these arguments had been rejected for the reasons fully explained in the January 30 opinion, that he had preserved the issue for appeal, and that the Court was not going to debate the matter with him further. (*Id.* at 11-12.) The Court then asked him directly, "Do you intend to make any statements in front of the prospective jurors or the jury that is picked. . . . without the express permission of this Court?" (*Id.* at 12.) Benabe did not wait for the Court to finish this question, interrupting the Court to again assert his jurisdictional arguments. (*Id.*) He continued to speak and to interrupt this Court, despite the Court's repeated efforts to redirect him to the Court's question about his courtroom behavior. (*Id.* at 12-13.) The Court asked him again whether he intended to speak without the Court's permission during trial, and advised him, "I'm going to ask you to listen closely to the question because if you do not answer the question, you will be removed from this courtroom, and you will not be here tomorrow." (*Id.* at 13.) Benabe continued to make non-responsive statements regarding the Court's lack of jurisdiction over him. (*Id.* at 13-14.) The Court then had the court reporter read back the question, and asked, "Mr. Benabe, do you understand the question? The question----" (*Id.* at 14.) Benabe interrupted the Court again, responding, "I understand very well, Judge. I'm illegally being prosecuted. This Court has not addressed that issue." (*Id.*) At that point, the Court directed the marshals to remove Benabe from the courtroom. (*Id.*)

The Court subsequently turned to Delatorre, inquiring whether he had read the Court's

21

January 30 opinion. *(Id.* at 15.) Delatorre responded that he had "never seen a copy of it." *(Id.)* He indicated an awareness that the Court was concerned about courtroom behavior, however, and stated, "[O]ut of fear of my life and the physical harm, I'm taking the liberty of addressing those concerns in writing, the Court's concerns. . . ." *(Id.)* He tendered a document to the Court, which this Court reviewed, in which he again made non-responsive statements regarding this Court's jurisdiction over him.[5] *(Id.)* Delatorre then complained that his attorney had not given him a copy of the Court's January 30 opinion. *(Id.* at 16.) The Court asked government counsel to give Delatorre a copy in open court. *(Id.)* Delatorre responded, "I would like to know if the order bears my true birth-given name on it. If it does not, I cannot accept it." *(Id.)* Delatorre was then given a copy of the opinion, but he rejected it because in his view it did not contain his proper name. *(Id.)*

The Court then asked him directly, "[A]s to your courtroom behavior, sir, do you intend to make any statements to either the prospective jurors who will be here tomorrow or the final jurors selected for this case without the permission of this Court?" *(Id.* at 17.) Delatorre refused to answer the question, but instead directed the Court to his filing. *(Id.)* The Court stated, "Do you understand my question?" *(Id.)* Delatorre again directed the Court to his filing and refused to give a direct answer, and did so a third time after the Court instructed the court reporter to read the question back to him. *(Id.* at 18.) The Court stated, "Mr. Delatorre, I've tried to be as patient as I can with you. I've written an opinion that in my view is---" *(Id.)* At that point, Delatorre interrupted the Court and stated that he'd never seen a copy of the opinion. *(Id.)* After further

---

[5] This document was not made part of the record, but Delatorre has attached it to his reply in support of his *pro se* post-trial motion. (R. 1046, Delatorre's *Pro Se* Reply, Ex. A.)

22

discussions in which Delatorre refused to provide a direct answer to the Court's question about his courtroom behavior, the Court directed the marshals to remove him from the courtroom. (*Id.* at 18-19.) Once again, Delatorre continued to speak until he was physically removed from the courtroom. (*Id.* at 19.)

At the close of the proceedings, the Court ordered the marshals to bring Delatorre and Benabe over to the courthouse the following day, the first scheduled day of trial, "as we try one last time." (*Id.* at 90.) The Court also made arrangements for a closed-circuit video camera to be set up in the courtroom so that Benabe and Delatorre could watch the proceedings from the MCC if necessary. (*Id.* at 21.)

On the first day of trial, Benabe and Delatorre were brought over to the courthouse, but they refused to meet with their attorneys or otherwise assure the Court that they would not disrupt the trial. (Trial Tr. at 4-5.) The Court ordered that these two defendants be excluded from the courtroom, but that they be permitted to watch the proceedings from the MCC if they wished to do so. (*Id.*) Benabe and Delatorre subsequently refused to watch the proceedings on video, and the Court eventually ordered the camera equipment removed from the courtroom so as not to distract the jury. (Trial Tr. at 84-85.) The Court advised that if either defendant expressed a desire to watch the proceedings, the courtroom equipment would be re-installed. (*Id.* at 85.) These defendants never indicated a desire to watch the trial, nor did they indicate a willingness to assure this Court that they would not disrupt the proceedings if allowed to return to the courtroom, and so the entirety of the trial proceeded in their absence.

As is apparent from a review of the record, this Court was faced with two defendants who continuously flouted this Court's authority, disrupted the proceedings, diverted attention away

23

from the multitude of logistical and substantive issues presented by this case, and refused to answer the Court's direct questions about whether they intended to conduct themselves with basic levels of decorum during the trial. This situation would have been difficult enough had Benabe and Delatorre been the only two defendants in this case. They were not. It was the duty of this Court to make every effort to safeguard the fair trial rights of the other five defendants, who were not disruptive during court proceedings. *Mannie*, 509 F.3d at 856-57. The stakes were particularly high given the complexity and estimated length of the trial in this case, which the government predicted could last up to four months. The jury pool was carefully prescreened for a trial of this length over the course of two months, background checks were conducted by pretrial services, and each potential juror filled out a lengthy background questionnaire. (*See* R. 543, 544; Trial Tr. at 19-23). Against this backdrop, the Court found it necessary to gain assurances from Benabe and Delatorre that they intended to conduct themselves appropriately during the trial. They refused to give a direct answer to the Court's questions, and instead gave every indication that they fully intended to disrupt the trial based on their view that they were being illegally detained by a Court with no jurisdiction over them. To allow these two defendants to appear at trial and immediately taint the carefully selected jury pool with their outbursts, causing months of delay, would not have been fair to the other defendants. *See Mannie*, 509 F.3d at 856-57.

This Court was thus left to consider the three options outlined by the Supreme Court in *Allen*: binding and gagging the defendants; finding them in contempt; or excluding them from the courtroom. As to the first option, this Court shares the Supreme Court's concern that binding and gagging a defendant, though constitutionally permissible, "is itself something of an affront to

24

the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Allen*,
397 U.S. at 344. The Supreme Court has also recognized that holding an unruly defendant in
criminal contempt will often be ineffective where the defendant is "charged with a crime so
serious that a very severe sentence such as death or life imprisonment is likely to be imposed."
*Id.* at 345. This was the case here, given that the defendants were facing the prospect of very
lengthy sentences. Indeed, the Court threatened the defendants with contempt, but this appeared
to have absolutely no effect on their ability to conform their behavior to acceptable standards.
(*See* 2/5/08 Tr. at 9.) This left the Court with the option of excluding the defendants from the
courtroom.

      As the record reflects, this Court made every effort to indulge these defendants, giving
them enormous leeway in voicing their thoughts and opinions, and attempting to communicate to
them in every means possible that their disruptive behavior, if continued, would result in their
absence from the courtroom during trial. Despite the Court's repeated warnings, these
defendants continued to interrupt the Court during pretrial proceedings, refused to answer the
Court's direct questions, and repeatedly asserted arguments that this Court had already rejected.
"[O]ur courts, palladiums of liberty as they are, cannot be treated disrespectfully with
impunity. . . . It would degrade our country and our judicial system to permit our courts to be
bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by
defendants brought before them charged with crimes." *Allen*, 397 U.S. at 346.

      Benabe and Delatorre suggest that they should not have been excluded until they acted up
during the trial itself. The defendants cite no case law, nor is this Court aware of any, requiring
the Court to proceed in this manner. These defendants gave every indication that they would

25

continue to make outbursts and otherwise disrupt the proceedings if permitted to be present during trial. As the Seventh Circuit recognized in *Mannie*, when a defendant is unruly or uncooperative, the trial court must take proactive steps to control the courtroom atmosphere and protect the rights of his co-defendants. Based on this Court's reading of *Mannie*, we could not sit idly by and allow Benabe and Delatorre to taint the jury pool, resulting in months of delay for the other defendants who were behaving appropriately.

In an analogous setting, the Seventh Circuit, applying *Allen*, held that the trial court did not err in revoking the defendant's Sixth Amendment right to represent himself based on his disruptive conduct during pretrial proceedings. *United States v. Brock*, 159 F.3d 1077 (7th Cir. 1998). *Brock* involved an unruly defendant who engaged in conduct similar to Benabe and Delatorre. For instance, the defendant "made requests that were denied by the district judge," and "expressed his dissatisfaction with the judge's rulings and explanations" by refusing to answer the court's questions and to cooperate in the proceedings. *Id.* at 1080. He made repeated challenges to the court's authority, demanding that the court provide him with a Bill of Particulars, a request the court had already denied. *Id.* In short, "[d]espite the district court's repeated attempts to secure his compliance, Brock stubbornly adhered to his policy of insisting that the court provide him with a Bill of Particulars and state the basis for its authority." *Id.* Based on the defendant's conduct during pretrial proceedings, the trial court refused to permit him to represent himself at trial. *Id.* On appeal, the defendant argued that the trial court violated his right to self-representation because he only acted up during pretrial proceedings and not at the trial itself. *Id.* at 1080. The Seventh Circuit rejected this argument, holding that the defendant had demonstrated a "lack of good faith cooperation with the court," and that his conduct during

26

pretrial proceedings "was a strong indication that [he] would continue to be disruptive at trial." *Id.* at 1081 & n. 3. Based on this conduct, the Seventh Circuit held that the trial court did not err in revoking the defendant's Sixth Amendment right to represent himself at trial. *Id.* at 1081.

Similarly, in *United States v. Brown*, 791 F.2d 577 (7th Cir. 1986), the Seventh Circuit affirmed the district court's decision to hold an unruly defendant in criminal contempt based on his pretrial conduct. The defendant, like Benabe and Delatorre, was unhappy with the Court's pretrial rulings and expressed his displeasure by refusing to cooperate in the proceedings. *Id.* at 577-78. He repeatedly asserted arguments that had been rejected by the trial court, despite the court's attempts to explain to him in detail why such arguments were unavailing. *Id.* at 578. Ultimately, the trial court told the defendant that if he refused to cooperate, he would be held in contempt. *Id.* The defendant was "polite but resolved," and steadfastly refused to cooperate based on his disagreement with the court's pretrial rulings. *Id.* The Seventh Circuit held that under these circumstances, the defendant had forfeited his right to represent himself and was properly held in contempt of court. *Id.* at 579. In approving the trial court's decision to hold the defendant in contempt, the Seventh Circuit reaffirmed that the court also had the option of removing the defendant from the courtroom and proceeding with the trial in his absence. *Id.* at 578.

As in *Brock*, the pretrial conduct of Benabe and Delatorre was a "strong indication" that they had every intention of continuing their disruptive conduct during trial. As in *Brown*, Benabe and Delatorre repeatedly flouted this Court's authority by refusing to answer questions and repeatedly raising arguments this Court had rejected, despite this Court's multiple attempts to explain to them why the arguments were unavailing and advising them that they had preserved

27

their arguments for appeal. "A court is entitled to obedience. Litigants. . . have the right to appeal. They may store up errors, but they must obey in the interim." *Brown*, 791 F.2d at 579. Given the behavior of Benabe and Delatorre, and the interests of the other defendants, the exclusion of these defendants was fully warranted in this case.

Furthermore, this Court made every effort to lessen the impact of the absence of these defendants during trial. During jury selection, the Court instructed the potential jurors as follows: "Let me also explain to you, ladies and gentlemen, two of the seven defendants are not here. Mr. Benabe and Mr. Delatorre have been excused from attending the trial by the Court for reasons that have nothing to do with the merits of the trial. Let me just say that Mr. Benabe and Mr. Delatorre, like all defendants, are presumed innocent and are entitled to a fair trial in which the government must prove the allegations against them beyond a reasonable doubt." (Trial Tr. at 73-74.) The Court also questioned the potential jurors about their ability to be fair to the two defendants who were absent. (Trial Tr. at 74-84.) Finally, at the close of the evidence, the Court instructed the jury as follows: "I have excused Defendant Bolivar Benabe and Defendant Fernando Delatorre from being present in the courtroom for reasons that have nothing to do with the merits of the trial. The fact that Defendant Benabe and Defendant Delatorre were not present during the trial should not enter into your deliberations in any way." (Trial Tr. at 6116.) The Court also instructed the jury on the government's burden of proof and the presumption of innocence enjoyed by all defendants through all stages of the trial. (Trial Tr. at 6116-18.) The jury is presumed to follow the Court's instructions.[6] *Wantuch*, 525 F.3d at 516. The jury's

---

[6] The Court notes that during a post-trial hearing on an unrelated issue, the jury foreperson testified that the absence of these two defendants from the trial played no role in the verdicts. (5/30/08 Tr. at 9.)

somewhat split verdicts are a strong indication that the jurors followed this Court's instructions.

For all of these reasons, the Court rejects the argument of Benabe and Delatorre that they were denied a fair trial based on their exclusion from the courtroom during trial.

## VIII. Benabe's Motion for a Competency Evaluation

Benabe next argues that the Court erroneously denied his request for a competency evaluation. (R. 1014, Joint Mot. at 24.) Based on his pretrial conduct detailed above, Benabe's attorneys requested that he undergo a competency evaluation. (R. 729.) The opinion of this Court, having presided over this case and observed Benabe on multiple occasions, was that Benabe was fully competent and that his behavior was a calculated attempt to delay and disrupt the proceedings. (Trial Tr. at 239-41.) The Court therefore denied the motion. (R. 740.) There are no new or compelling arguments in the post-trial motion that convince the Court that the prior ruling was error, or that a new trial is warranted on this ground.

## IX. Anonymous Jury

The defendants next argue that the Court erred in granting the government's motion to empanel an anonymous jury. (R. 1014, Joint Mot. at 24-26.) This issue, too, was briefed by the parties prior to trial. (R. 597, 639.) This Court issued an opinion granting the government's request for an anonymous jury, and fully explaining its reasons for doing so. *Delatorre*, 2008 WL 161702, at *1-4. The Court carefully considered all of the defendants' arguments against empaneling an anonymous jury, but determined that, given the facts of this case, there was a credible risk that members of the jury could be in jeopardy of intimidation, and that jurors would have undue concerns for their own safety. *Id.* at *2-3. Without recounting all of the reasons again here, the Court continues to view this as an unfortunate but necessary measure in this case.

29

In their post-trial motion, the defendants argue that "subsequent proceedings regarding Juror 79 have demonstrated that restricted information available about potential jurors limited the defendants' exercise of peremptory challenges in this case, with potentially significant consequences." (R. 1014, Joint Mot. at 25.) The defendants do not explain the basis for this argument, but as fully detailed in this Court's opinion addressing the allegations of juror misconduct, this Court disagrees that the defendants were denied a fair trial based on the presence of Juror 79, or any of the other jurors, on the jury. *See Delatorre*, ---F. Supp. 2d---, 2008 WL 3893772, at *13-21. For these reasons, the Court rejects the defendants' argument.

## X.    Testimony of Mario Gomez

The defendants next argue that this Court erred in permitting Mario Gomez ("Gomez") to testify. (R. 1014, Joint Mot. at 27-28.) Gomez was the victim of a shooting on September 28, 2002, which left him paralyzed and confined to a wheelchair. The defendants argue that "Mr. Gomez's wheelchair and his emotionally depressed demeanor during the testimony rendered Mr. Gomez's testimony inflammatory and unfairly prejudicial." (*Id.*) This Court determined that Gomez's testimony was admissible under Rule 403, and the Court continues to view this as the appropriate ruling. Gomez's testimony was highly relevant, given that the gun used to shoot him was ultimately connected to the Insane Deuces. Furthermore, Gomez's testimony was not cumulative, as the defendants argue. (R. 1014, Joint Mot. at 27.) Although Gomez's brother also testified about the circumstances leading up to the shooting, his brother was not present during the shooting itself, and thus could not provide the location of the shooter provided by Gomez. The location of the shooter was critical since it established the location of a spent shell casing recovered from the scene; this shell casing was used to connect the gun to the Insane

30

Deuces. In short, the testimony of Gomez was properly admitted.

## XI. Testimony of John Rea

The defendants next argue that this Court erred in precluding the testimony of John Rea, a defense investigator who would have testified concerning statements made to him by Luis Lomelli ("Lomelli") about his participation in a shooting along with government witness Orlando Rivera. (R. 1014, Joint Mot. at 28-32; R. 1012, Juarez's Mot. at 6-10.) In essence, the defense contends that Rea would have testified that on August 11, 2002, Rivera was driving a car in which Lomelli was a passenger, and that Lomelli fired multiple rounds at a Latin King gang member. This issue was briefed during the trial, and the Court also heard oral argument from both sides on this issue. (R. 841; Trial Tr. at 4759-60, 4854-59.) After considering the parties' respective arguments, this Court determined that Lomelli's statements were not admissible under Rule 804(b)(3), because the portion of the statement inculpating Rivera was not against Lomelli's penal interest and did not bear indicia of reliability, and further, that the statement was inadmissible under Rule 608(b). (Trial Tr. at 4857-59.) There is nothing contained in the post-trial motion to convince the Court that it was error to exclude this hearsay statement for the reasons previously stated. Even assuming it was error to exclude the statement, such error would have been harmless, given the strength of the government's evidence and the fact that the defendants were permitted to attack Rivera's credibility on numerous other grounds. *See United States v. Savage*, 505 F.3d 754, 762 (7th Cir. 2007) (new trial warranted only where exclusion of evidence "had a substantial influence over the jury and the result reached was inconsistent with substantial justice."). For these reasons, the Court rejects the defendants' argument.

31

## XII.  Admission of Summary Chart

The defendants next argue that the Court erred in admitting into evidence a summary chart of multiple violent acts committed by Rivera. (R. 1014, Joint Mot. at 33-38.) The government prepared the chart to streamline the testimony of Rivera, who admitted being involved in upwards of 40 violent acts during his time in the Insane Deuces. After considering all of the defendants' objections, the Court admitted the summary chart under Rule 1006, as well as Rules 401 and 403. (Trial Tr. at 1494.) The Court continues to view the admission of the chart as proper for the reasons previously stated. Moreover, even if it was error to admit the chart, it is difficult to discern how the defendants were prejudiced by its admission. One of the main defense themes throughout the trial was that the jury should not believe the testimony of Rivera, who was the government's key witness, in part because he himself had been involved in multiple acts of violence. If anything, the summary chart served as a constant reminder to the jury of the multiple violent acts in which Rivera admitted being involved, thus impeaching his credibility. Indeed, in their closing arguments, virtually every defense attorney attacked Rivera's credibility by either referring to the chart or by mentioning the fact that Rivera admitted to personally participating in over 40 separate acts of violence. For these reasons, the Court rejects this argument.

## XIII.  Jury Instructions

The defendants next challenge three different instructions given to the jury. The Court addresses each in turn.

### A.    Aiding and Abetting

The defendants first argue that the Court erred when it gave the Seventh Circuit's pattern

32

jury instruction on aiding and abetting. (R. 1014, Joint Mot. at 38-39.) Instead, the defendants

wanted the Court to instruct the jury that to be guilty of aiding and abetting the racketeering

conspiracy, the defendant must have "knowingly assisted in the commission of at least two of the

predicate acts set forth in paragraph 11 of Count One." (R. 831.) This proposed instruction was

not a correct statement of the law following the Supreme Court's decision in *Salinas*, and it was

proper to give the Seventh Circuit pattern instruction. Accordingly, the Court finds no merit to

the defendants' argument.

## B.     Ostrich Instruction

Benabe argues that the Court erred in giving Seventh Circuit Pattern Instruction 4.06,

known as the "ostrich" instruction. (R. 1014, Joint Mot. at 39.) At trial, Benabe's defense was

that, although he was a member of the Insane Deuces, he was based in Chicago far from Aurora,

and that he was merely an administrator for the gang, and was not involved in any of the violence

that occurred in Aurora. In short, there was evidence that Benabe intentionally turned a blind eye

to the violence committed in Aurora by the Insane Deuces, and the ostrich instruction was

therefore appropriate. *United States v. Black*, 530 F.3d 596, 604 (7th Cir. 2008) (ostrich

instruction appropriate where there is evidence defendant was willfully ignorant of criminal

activity).

## C.     *Pinkerton* Instruction

The defendants next argue that the Court erred in giving the *Pinkerton* instruction[7] during

---

[7] Under *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946), a member of a
conspiracy is criminally responsible for a substantive offense committed by his co-conspirators if
he was a member of the conspiracy when the offense was committed, and if the offense was
committed in furtherance of and as a foreseeable consequence of the conspiracy.

33

the second phase of the jury's deliberations. (R. 1014, Joint Mot. at 39-40.) During the second phase of the trial, the jury was asked to decide whether each defendant's participation in the RICO conspiracy was based on certain types of racketeering activity, in this case, four first-degree murders. The Court instructed the jurors that "a person commits the offense of first degree murder when he, or one for whose conduct he is legally responsible, kills an individual, if in performing the acts which cause the death, the person, or one for whose conduct he is legally responsible . . . intended to kill or do great bodily harm to that individual." (R. 945 at 6.) Under the facts of this case, the defendants could be held responsible for first-degree murder under three possible theories: (1) as a direct participant; (2) as an aider, abettor, counselor, or commander; or (3) under *Pinkerton*. The instruction given was an accurate statement of the law.

Contrary to the defendants' assertion, the Seventh Circuit has not held that the *Pinkerton* instruction cannot be given in conspiracy cases. (*See* R. 1014, Joint Mot. at 40.) The Court in a 1986 opinion raised a question about the value of giving the instruction in RICO conspiracy cases, given that in such cases the defendant can already be punished for substantive offenses without invocation of *Pinkerton*. *See United States v. Neapolitan*, 791 F.2d 489, 504 n.7 (7th Cir. 1986) ("Given that implicit within the compound nature of RICO is a concept of punishment for substantive offenses, the commission of which was agreed to by the defendant, it is difficult to see why the government needs to invoke a second cumulative punishment device in the form of *Pinkerton*."), *modified on other grounds by Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000). Nevertheless, the Court expressly stated that "there is nothing in RICO precluding the use of *Pinkerton* instructions," nor is there anything "wrong or improper" about giving the instruction in RICO conspiracy cases. *Id.* The Court has reaffirmed that principle in

34

subsequent cases. *See United States v. Campione*, 942 F.2d 429, 437-38 (7th Cir. 1991); *United States v. Caliendo*, 910 F.2d 429, 438 (7th Cir. 1990). The instruction was proper for the reasons stated above, and the Court finds no basis to grant a new trial on this ground.

## D.     Verdict Forms

The defendants next argue that the Court erred in using the government's proposed verdict forms in phase two of the deliberations. (R. 1014, Joint Mot. at 40-41.) This issue was briefed prior to the verdict, and the Court fully considered the arguments of the defendants regarding the verdict forms. (R. 890, 900, 901.) The Court continues to view the verdict forms used as setting forth in a logical and straightforward manner the various questions the jury needed to answer in phase two. Accordingly, the Court rejects this argument.

## XIV.  Transcripts in Jury Room

The defendants argue that the Court erred by providing the jury with transcripts in the jury room. (R. 1014, Joint Mot. at 41-42; R. 1012, Juarez's Mot. at 3-6.) During their deliberations, the jury requested that they be allowed to review certain transcripts from the trial. The defendants objected to this request, but after fully considering the defense arguments, the Court overruled the objections and permitted the jury to have the transcripts. (*See* Trial Tr. at 6203-25.) The Court reasoned: "The jury has been deliberating now almost a week. It's a very careful deliberation, as far as I can tell. . . . The jury has made a very pointed request for certain testimony. I believe we should assist them." (Trial Tr. at 6217.) In sending the transcripts back to the jury room, the Court gave the following limiting instruction:

> Enclosed are the exact trial transcripts you requested yesterday
> afternoon. As you well know, these transcripts are only a portion
> of the entire trial. Any testimony that was inadmissible or any part

35

of the transcript that occurred outside your presence has been
removed. You must keep in mind that the trial testimony itself is
the evidence and not the raw transcripts. The transcripts cannot
replace each juror's collective memory of a witness's credibility.
You must, therefore, weigh all the trial evidence and not just one
particular portion of the trial. Also, please note that each of the
witnesses' direct testimony you have requested was also
cross-examined by the defense. The entire testimony of each
witness you have identified can be made available to you at your
written request. Your verdicts must be based on my entire jury
instructions and all the evidence.

(Trial Tr. at 6225-26.) The Court continues to view the decision to send the transcripts to the

jury room as an appropriate exercise of its discretion. *See United States v. Crowley*, 285 F.3d

553, 561 (7th Cir. 2002), *superseded on other grounds as stated in United States v. Rodriguez-*

*Cardenas*, 362 F.3d 958 (7th Cir. 2004); *United States v. Keskey*, 863 F.2d 474, 476 (7th Cir.

1988). The defendants do not raise any argument not fully considered by the Court in ruling on

this issue at trial, and the Court finds no basis to grant a new trial on this ground.

## XV. Juarez's *Franks* Hearing

Juarez argues that the Court erred in denying him a *Franks* hearing with respect to the

search warrant executed at his house on March 8, 2002. (R. 1012, Juarez's Mot. at 10-15.) To

obtain a *Franks* hearing, a defendant must make "a substantial preliminary showing that a 'false

statement knowingly and intentionally, or with reckless disregard for the truth, was included by

the affiant in the warrant affidavit, and the allegedly false statement is necessary to the finding of

probable cause.'" *United States v. Hoffman*, 519 F.3d 672, 675 (7th Cir. 2008) (*citing Franks v.*

*Delaware*, 438 U.S. 154, 155-56 (1978).) Juarez points to three allegedly false statements in the

warrant affidavit which he believes entitled him to a *Franks* hearing. (R. 1012, Juarez's Mot. at

11-12.) The Court fully considered Juarez's arguments at trial and declined to hold a *Franks*

hearing. (Trial Tr. at 3477.) Juarez has not established that the challenged statements were knowingly or intentionally false. Even assuming he could do so, the affidavit contained information sufficient to establish probable cause even without considering the challenged statements. Accordingly, the Court finds no basis to grant a new trial on this ground.

## XVI. Motion to Reconsider Juror Issues

The final matter to be addressed is the defendants' motion to reconsider the Court's August 21, 2008, opinion denying their post-trial motions alleging juror misconduct. (R. 1050, Joint Mot. to Reconsider.) For reasons fully explained in the opinion, after considering all of the defendants' arguments, this Court concluded that no further evidentiary hearing or other type of relief was warranted on the grounds of alleged juror misconduct. *See Delatorre*, 2008 WL 3893772. The motion to reconsider contains no arguments not already given careful consideration by the Court, and the Court finds no basis within the motion to alter its prior ruling. Accordingly, the motion is denied.

## CONCLUSION

For the reasons stated herein, the defendants' motions for acquittal or a new trial (R. 1005, 1012, 1014, 1015) are denied. The defendants' motion to reconsider (R. 1050) is also denied. In deference to the related trial currently proceeding before Judge Leinenweber, *see supra* footnote 1, this Court will not proceed with any sentencing proceedings for these defendants until the related trial has been completed.

Entered:

Judge Ruben Castillo
United States District Court

Dated: October 8, 2008

37